## WILHELM v THE DETROIT EDISON COMPANY

1. TRIAL—DIRECTED VERDICT—APPEAL AND ERROR—JURY QUESTION.

The test for reviewing a refusal of a directed verdict is whether, viewing the facts most favorably to the opposing party, reasonable men could differ; if they can, the question is for the jury.

2. NEGLIGENCE—FORESEEABLE DANGER—ELECTRIC POWER COMPANIES —HIGH VOLTAGE WIRES.

Danger should have been foreseen by an electric power company which installs or maintains high voltage wires where there is a likelihood or reasonable probability of human contact with the wires by persons who have a right to be in a place from which such contact is possible.

3. NEGLIGENCE—FORESEEABLE DANGER—EVIDENCE—ELECTRIC POWER COMPANY—HIGH VOLTAGE WIRES—ELECTROCUTION.

Evidence was sufficient to present a question for the jury as to whether a defendant electric power company should have foreseen the reasonable probability that a maintenance worker or painter would come in contact with its high voltage wires where the wires met a building just below metal trim, there

REFERENCES FOR POINTS IN HEADNOTES

[1] 75 Am Jur 2d, Trial § 489.
[2–5] 26 Am Jur 2d, Electricity, Gas and Steam §§ 39, 42, 43, 48.
[6] 75 Am Jur 2d, Trial §§ 164, 166.
[7] 62 Am Jur 2d, Premises Liability § 62 et seq.
[8] 62 Am Jur 2d, Premises Liability §§ 66, 69–71.
[9] 22 Am Jur 2d, Death § 216.
[10] 22 Am Jur 2d, Death § 215.
[11] 73 Am Jur 2d, Statutes §§ 142, 143.
[12] 5 Am Jur 2d, Appeal and Error § 881.
[13, 15] 31 Am Jur 2d, Expert and Opinion Evidence § 1.
[14] 31 Am Jur 2d, Expert and Opinion Evidence § 148.
[16] 31 Am Jur 2d, Expert and Opinion Evidence §§ 149, 150.
[17] 57 Am Jur 2d, Negligence § 280.
[18] 22 Am Jur 2d, Death § 135.
[19] 18 Am Jur 2d, Contribution § 1.
[20] 57 Am Jur 2d, Negligence §§ 6, 7.
[21] 73 Am Jur 2d, Summary Judgment § 26 et seq.

was insufficient space in which to paint the trim, a person attempting to paint the trim had to use a ladder and stand near the wires, and the defendant was involved in the planning, inspection and approval of the electrical installation.

4. NEGLIGENCE—DUTY TO WARN—ELECTRIC POWER COMPANY—HIGH VOLTAGE WIRES.

An electric power company providing electricity to a shopping mall had a duty to warn persons legally on the premises doing any kind of work that could reasonably be expected to be performed near dangerous, uninsulated, high voltage power lines.

5. NEGLIGENCE—RENDITION OF SERVICES—REASONABLE CARE—THIRD PARTIES—RISK OF HARM.

One who undertakes to render services to another which he should recognize as necessary for the protection of a third party or his things is subject to liability for physical harm resulting from his failure to exercise reasonable care to protect his undertaking if his failure to exercise reasonable care increases the risk of harm.

6. TRIAL—INSTRUCTIONS TO JURY—APPEAL AND ERROR—OBJECTIONS—COURT RULES.

Alleged error in a jury instruction has not been preserved for appellate review where no timely objection was made (GCR 1963, 516.2).

7. NEGLIGENCE—PROPERTY OWNERS—INVITEES—DANGEROUS CONDITIONS—DUTY TO WARN.

A property owner has a duty to warn an invitee, contractor, or subcontractor performing services on the premises of hidden defects or dangerous conditions located thereon except where the defect or condition is obvious to the invitee, contractor, or subcontractor.

8. NEGLIGENCE—PROPERTY OWNERS—INVITEES—DUTY TO WARN—REASONABLE CARE—HIDDEN HAZARDS—JURY QUESTION.

It was a jury question whether a defendant shopping mall breached its duty to exercise reasonable care to protect an invitee who was electrocuted while painting metal trim, where the mall knew the painting activity was being carried on in close proximity to dangerous, uninsulated, high voltage power lines, no warning sign or verbal advice was provided, and the painter was not well aware of the hazard involved.

9. NEGLIGENCE—WRONGFUL DEATH—PRESUMPTIONS—DUE CARE—WITNESSES.

The decedent in a wrongful death case is presumed to have been in the exercise of due care for his safety where there were no eyewitnesses to his death.

10. NEGLIGENCE—WRONGFUL DEATH—CONTRIBUTORY NEGLIGENCE—ELECTROCUTION—HIGH VOLTAGE WIRES.

A plaintiff's decedent, electrocuted while painting near high voltage wires, was not guilty of contributory negligence as a matter of law where, upon the evidence presented, all reasonable men could not inevitably conclude that the decedent was contributorily negligent.

11. STATUTES—CONSTRUCTION SAFETY ACT—RULES—APPLICABILITY.

A rule prohibiting the use of metal ladders near electric lines, promulgated pursuant to the construction safety act, is inapplicable to a painting company, hired to repaint certain portions of a building, which is not part of the construction industry (MCLA 408.712[b], 408.717; 1964-1965 AACS, R 408.2204).

12. EVIDENCE—TRIAL—RELEVANCY—DISCRETION—APPEAL AND ERROR.

The determination of the relevancy of proffered evidence is within the reasonable discretion of the trial judge, and appellate courts intervene only when clear abuse is shown.

13. WITNESSES—EXPERT WITNESSES—EVIDENCE—ADMISSIBILITY.

There must be knowledge in a particular area that belongs more to an expert than to the common man, before expert testimony is admissible.

14. WITNESSES—EXPERT WITNESSES—EVIDENCE—NEGLIGENCE—FORESEEABILITY—REASONABLE CARE—ADMISSIBILITY—DUTY.

The admission of expert testimony regarding upkeep and maintenance considerations in a construction project was proper where the testimony did not tend to establish a duty higher than that to which the defendant was already bound, but merely went to the questions of foreseeability and reasonable care.

15. WITNESSES—EXPERT WITNESSES—EVIDENCE—ARCHITECTURAL PLANNING—ELECTRICAL SERVICES—SAFETY—COMMON KNOWLEDGE—ADMISSIBILITY.

Architectural planning for maintenance and the safety of maintenance workers as well as the installation of electrical services are areas beyond the common knowledge of ordinary people;

therefore, expert testimony on such subjects was properly admitted.

16. EVIDENCE—PRODUCTS LIABILITY—ADMISSIBILITY—SAFETY—METHODS AND DESIGNS—WITNESSES—EXPERT WITNESSES.

Evidence in a products liability case as to what is thought by some to be a safer design or a safer method is generally inadmissible to show negligence.

17. NEGLIGENCE—ASSUMPTION OF RISK—ACCEPTED WORK DOCTRINE.

The assumption of risk and accepted work doctrines have been abolished in Michigan.

18. NEGLIGENCE—WRONGFUL DEATH—STATUTES—WRONGFUL DEATH ACT—DAMAGES—LOSS OF COMPANIONSHIP.

Loss of companionship is an element of damage under the wrongful death act (MCLA 600.2922).

19. CONTRIBUTION—TORTS—STATUTES.

Contribution is a statutory right and it comes into use where two or more tortfeasors cause a single indivisible injury to a third party; if the third party elects to sue only one of the joint tortfeasors, the other tortfeasor may be joined as a third-party defendant (MCLA 600.2925).

20. TRIAL—JURY QUESTION—NEGLIGENCE—PROXIMATE CAUSE—FORESEEABILITY.

Questions of negligence, proximate cause and foreseeability are almost always questions for the jury.

21. JUDGMENT—SUMMARY JUDGMENT—MOTIONS—COURT RULES.

A motion for summary judgment made before trial has commenced is not to be granted unless it can be said, giving the benefit of every reasonable doubt to the party opposing the motion, that there is no genuine issue as to any material fact (GCR 1963, 117.2[3]).

Appeal from Wayne, Michael Carland, J. Submitted Division 1 June 13, 1974, at Detroit. (Docket Nos. 18565, 18566.) Decided October 9, 1974. Leave to appeal denied, 393 Mich 787.

Complaint by Mildred E. Wilhelm, administratrix of the estate of Gerald T. Wilhelm, deceased, against The Detroit Edison Company, Eugene J. Arnfeld, Aaron H. Gershenson, William Gershen-

son, and James H. Wineman, doing business as the Pontiac Mall Shopping Center, and A & W Gershenson Corporation for damages resulting from wrongful death by electrocution. Third-party complaint by the Pontiac Mall and A & W Gershenson Corporation against Harlan Electric Company, Walter L. Couse Company, and Ornamental Iron & Stair Company for indemnity or contribution. Judgment for plaintiff. Summary judgments for third-party defendants. Defendants appeal. Third-party plaintiffs appeal. Judgment for plaintiff affirmed. Judgments for third-party defendants reversed and remanded.

*Goodman, Eden, Millender, Goodman & Bedrosian* (by *George J. Bedrosian* and *Paul A. Rosen),* for plaintiff.

*Fischer, Franklin & Ford* (by *Francis E. Bentley),* for The Detroit Edison Company.

*Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen,* for Pontiac Mall Shopping Center and A & W Gershenson Corporation.

*Garan, Lucow, Miller, Lehman, Seward & Cooper,* for Harlan Electric Company.

*Martin, Bohall, Joselyn, Halsey & Rowe* (by *Christopher L. Terry),* for Walter L. Couse Company.

*Hyman & Rice* (by *Jefferson F. Riddell),* for Ornamental Iron & Stair Company.

Before: J. H. GILLIS, P. J., and ALLEN and ELLIOTT,* JJ.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

ALLEN, J. Defendants Detroit Edison Company (Edison) and the Pontiac Mall Shopping Center (Mall) appeal from a jury verdict of $325,000 granted in favor of plaintiff for the wrongful death of her husband, Gerald, who was electrocuted on August 11, 1965, while painting some metal trim near some high-tension electric lines. The Mall has also appealed from the trial court's order granting summary judgment in favor of the third-party defendants, against whom the Mall had sought contribution and/or indemnity. The trial court denied both defendants' motions for judgment notwithstanding the verdict and for a new trial, and also denied the Mall's motion for a new trial on its cause of action against the third-party defendants.

Plaintiff's decedent, Gerald Wilhelm, was a painter employed by the I. H. Hill Painting Company, had been so employed for approximately 12 years before his death, and was the foreman of the crew engaged in the painting project at the Pontiac Mall. He had two sons, Gerald, Jr., who was seven years old at the time of his father's death, and Michael, then aged five and an orthopedically handicapped child requiring repeated hospital visits, placement in a school for the orthopedically handicapped, and constant attention from his mother. Mildred Wilhelm, plaintiff herein, married Gerald September 5, 1956, and was 34 years old when her husband died. It was plaintiff's theory that the Mall had failed to use a high degree of care regarding the installation of the electrical service near the point at which her husband met his death. Plaintiff claimed that the Mall had a duty to provide Wilhelm with a safe place to work, knew that the metal trim around the edge of the building known as "flashing" or "coping" needed painting, and failed to properly insulate wires, failed to provide a proper wire screen around the

wires, and failed to adequately warn of the danger. Plaintiff claimed that Detroit Edison was involved in the planning, inspection and the approval of the electrical installation, and that it had failed to use a high degree of care in the course of engaging in these duties.

The Pontiac Mall was the first enclosed shopping center built in Michigan. Charles N. Agree, Inc., an architectural firm, was hired by Pontiac Mall to design the complex, and David Zabner, a mechanical engineer also trained in electrical engineering, was hired as a consultant on the project by the Agree firm. Detroit Edison provided Zabner with what was known as an "XPC drawing", a conceptual design prepared by Detroit Edison for the project planners. These plans showed how the electrical service was to be provided to the Mall. Edison was to provide the service to the Mall, and the Mall would then own the electricity and sell it, pursuant to approval from the Michigan Public Service Commission, to its tenants. The XPC drawings showed that a protective fence was to be built on top of a wall above the point at which the electrical lines met the buildings, and a sign was to be attached to the fence, indicating the presence of danger, namely, 4800 volts. This sign was to be placed on a fence so that a person standing on the roof could read it.

The plans also called for this fence to be constructed 4 inches away from the brick facing of the building. In 1961, the Mall contracted with the Walter Couse Company to build the protective fence above the electrical installation. Couse in turn contracted with the Ornamental Iron Company which built the fence only 1/2 inch away from the wall. The Mall paid for the fence. In 1964, when it was deemed necessary to provide

additional electrical service to the Mall, the Mall contracted with Harlan Electric Company to build a protective fence above the second electrical installation. Although the plans called for a similar 4-inch distance between the fence and the wall, the blueprints contained the notation "fence to match existing" fence. Harlan then built the fence 1/2 inch away from the wall, and it was near this point that plaintiff's decedent met his death. The parties involved in building the fences were joined by the Mall as third-party defendants, and successfully obtained summary judgment in their favor previous to trial. GCR 1963, 117.2(3).

The metal "flashing" or "coping" supposedly required painting every two to five years, depending on the weather. The Hill Painting Company made a contract with the Mall to do that painting, and Mr. Mudloff, in charge of maintenance for the Mall, took Mr. Hill on a tour around the Mall to show him which areas to paint and not to paint. Witnesses testifying for Detroit Edison could not recall if a representative of the Mall ever requested the power to be shut off while this painting was being done near the electrical lines, although testimony was presented that this was the safest way in which to paint near the lines.

Melvin H. Sachs, an architect, testified that the electrical installation, with the fence built only 1/2 inch from the wall, presented an unsafe condition and that a man could not paint it while standing on the roof, but instead had to use a ladder to reach that area. If there was a 4-inch space between the wall and the fence, the painter could have stood on the roof and reached down to paint the metal trim. As an alternative, the electric lines could have been installed underground rather than overhead, but Charles Agree testified

that the owners of the Mall, with cost as their prime consideration, decided that the lines should be overhead. However, Zabner testified that the XPC drawing prepared by Edison showed that the lines were to be overhead, and he said that he did no "layout work" regarding this project before he went to Detroit Edison and received those plans.

As indicated above, the Edison Company supplied the electrical power to the Mall. It provided the Mall's architect and planners with the "XPC drawings", and the specifications for the project indicated that the entire electrical system was to meet Detroit Edison approval. Although the drawings provided that the fence was to be built on top of the parapet wall, a wall that extends above the roof, no such wall was built. Employees of Edison, although unable to recall any discussions regarding the need for painting the metal trim, had the authority to resist turning on the power if the owner had not constructed the electrical installation, including the fence, pursuant to Edison plans. The wires met the building at the west wall above the SS Kresge store, 23 feet and 5 inches above ground, well in excess of the 20 feet electrical code requirement. However, no warning sign was placed on the wall, nor was the fence built in such a way that a person involved in maintenance work near the lines, such as a painter, would be aware of the danger of the uninsulated lines or would be protected from the same. However, the director of Edison's engineering division testified that the electrical installation met good industry construction practice, and that it met the Michigan Public Service Commission requirements contained in 1966 AACS, R 460.540 and R 460.541. He testified that the safest way to remove any danger was by de-energizing (shutting off the power) and that

Detroit Edison would have done so upon request from the Mall.

Both defendants asserted that Gerald Wilhelm was contributorily negligent. Testimony was presented that it was unsafe to use a ladder near the electrical installation. However, Mr. Hill, Wilhelm's employer, testified that he did not regard the wires as dangerous because they were so thick he assumed that they were insulated. Although it was easier to paint from the roof, Wilhelm had to use a ladder at this point because of the fence. Other painters testified that they generally avoid touching wires, and testimony was received that either Wilhelm or the other foreman on the job had cautioned the painters about the "wire cage" on the roof. However, at the time of the accident, August 1965, no wire cage was present on the roof, and one was not constructed until sometime in 1966. Another painter on the crew testified that no one from the Mall ever told the painters to avoid the area near the electrical installation, that the painters were not advised that the wires were high tension wires, although on previous painting projects the power was usually shut off if painting near wires was necessary.

The record was substantial, and other facts relevant to the many problems in this case will be presented in conjunction with discussion of the issues.[1] The issues can be broken down into six general areas, of which all but the last relate to the integrity of the jury verdict against defendants Edison and the Mall. The sixth issue concerns the Pontiac Mall's potential right of contribution from the third-party defendants.

---

[1] Appellants' briefs raise 15 issues which, for purposes of this opinion, are categorized in the 6 general areas. *Infra,* within the 6 areas, all 15 issues are discussed.

I. *Did either Edison or the Mall owe a duty to plaintiff's decedent? If so, does the record contain sufficient evidence of a breach of duty to sustain the trial court's denial of motions for a directed verdict in favor of defendants?*

Relying upon *Koehler v Detroit Edison Co,* 383 Mich 224; 174 NW2d 827 (1970), Edison argues that it owed no duty to plaintiff, and that the trial court erred in failing to grant Edison's motion for directed verdict. According to *Mackey v Island of Bob-Lo Co,* 39 Mich App 64, 65; 197 NW2d 151, 152 (1972):

"The test for reviewing a refusal of a directed verdict * * * is whether, viewing the facts most favorably to the opposing party, reasonable men could differ. If they can, the question is for the jury."

Viewing the evidence in a light favorable to plaintiff, the court must determine whether there was any evidence which was competent and sufficient to support the jury's finding. If so, we should not reverse that finding. *Kupkowski v Avis Ford, Inc,* 51 Mich App 668, 670; 215 NW2d 767 (1974).

The situation at hand is governed by the following rule:

"The test to be applied is, was there a likelihood or reasonable probability of human contact with the wires by persons who had a right to be in a place from which such contact was possible? If so, the danger should have been foreseen or anticipated by the defendant. [Omitted citations.] It is not necessary that the manner in which a person might suffer injury should be foreseen or anticipated in specific detail. * * * The care to be observed by it [defendant] must be in proportion to the danger involved and extends to every place where persons have a right to be, whether for business, conve-

nience or pleasure." *Clumfoot v St Clair Tunnel Co,* 221 Mich 113, 117; 190 NW 759 (1922).

*Clumfoot* affirmed a judgment for a plaintiff who, while in the course of unloading a railroad car, lost his balance, threw up his hands and came in contact with some electric wires which ran to a box located on a wall near the door of the railroad car. 221 Mich 113, 115. *Clumfoot* said that the case presented a question for the jury to determine whether an ordinary prudent person, installing or maintaining high voltage wires near a place where men were engaged in work such as that performed by plaintiff should have "foreseen or anticipated that contact with such wires would probably result". 221 Mich 113, 117. *Huber v Twin City General Electric Co,* 168 Mich 531, 535; 134 NW 980 (1912), noted that "the handling of electrical currents of high voltage is a business extremely hazardous" and said that persons in the electrical business "are charged with the duty of exercising a very high degree of care for the protection of life".

*Koehler, supra,* without referring to the cases discussed above, affirmed a directed verdict rendered in favor of Edison. In that case, plaintiff, an ironworker, came in contact with some power lines while he was riding on a cable which was in turn connected to a crane. The wires were 30 to 35 feet above ground level, and plaintiff struck the wires as the crane swung the cable over near the power lines. 383 Mich 224, 227–228. *Koehler* found in favor of Edison, noting that "there is no testimony in this case from which a jury could find that the operation carried on with the crane was dangerous because of Detroit Edison's distribution line". The court noted that the evidence showed that there was "sufficient room in which to work", and that

the ironworkers on the job "fully understood the danger from electric wires and the importance of staying away from them". The court noted that there was no reason to expect any difficulties from the line and no reason to alert Edison that a crane was being used, and that plaintiff, the other workers and other defendants were aware of the presence of a line and could have requested Edison to insulate the line if they thought it was necessary to do so. Also, Edison was not advised of the operation nor was it requested to take any precautions. The court said that the fact that Edison knew that a building was under construction near its power line and that occasionally mobile cranes were used at this construction work, "would not, standing alone, create a duty upon Detroit Edison to remove the charge, insulate the line, or notify the parties of a dangerous condition". 383 Mich 224, 231.

In the instant case, a view of the evidence favorable to plaintiff shows that there was insufficient space in which to paint the metal trim near the power lines. The uninsulated lines, carrying 4800 volts, met the wall just below the metal trim, and the fence was located so near the wall that a person, such as plaintiff's decedent, attempting to paint the metal trim had to use a ladder and stand near the lines rather than stand on the roof and reach over to paint the trim. Wilhelm's boss, Mr. Hill, an experienced painter, did not regard the wires as dangerous, stating they were so thick that he assumed they were insulated. Also, unlike the situation in *Koehler,* evidence was present to indicate that Edison was involved in the planning, inspection and approval of the electrical installation, and that Edison could resist turning on the power if its plans were not met. Although the

Edison employees involved in both the 1961 and the 1964 electrical installations could not recall whether they were apprised of the presence of the metal trim or its need for painting every two to five years, we find that the evidence was sufficient to present a question to the jury as to whether Edison should have foreseen or anticipated the "reasonable probability" that a maintenance worker, or painter, such as plaintiff's decedent, would come in contact with the wires. *Clumfoot, supra.*

Edison did not, of course, have the duty to foresee or anticipate "every possible fortuitous circumstance that might cause injurious contacts with those power lines". *Dees v L F Largess Co,* 1 Mich App 421, 427; 136 NW2d 715 (1965). *Dees* said that the wires involved were insulated by 35 feet of air space "from any foreseeable contact" and that Edison lacked the duty to add insulation "in anticipation of construction in the area". 1 Mich App 421, 427. While the lines at issue were located 23 feet, 5 inches above the ground, and thus were insulated by air space as far as one staying on the ground was concerned, MCLA 460.552, 460.554; MSA 22.152, 22.154 and 1954 AC, R 460.521(38) (cited in *Dees, supra),* the lines were not insulated or protected from any foreseeable contact at the point where they met the building. Edison must have anticipated the presence of persons near the lines because they chose to plan for and require the protective fence. No warning sign was placed so that a person standing on a ladder and looking towards the wall would be able to be advised of the danger, and the wires were uninsulated. Unlike contact by a crane in a construction project as in *Dees,* or an airplane collision with the power lines where the plane chose not to use the

regular approach pattern as in *Gunn v Edison Sault Electric Co,* 24 Mich App 43, 46; 179 NW2d 680 (1970), the instant case does not involve a "fortuitous circumstance", but was rather reasonably foreseeable. Unlike *Carr v Detroit Edison Co,* 49 Mich App 332, 340; 212 NW2d 70 (1973), the evidence failed to disclose that Wilhelm was "admittedly aware" of the danger present in the uninsulated wires, or even that the wires were not insulated. *Hobbs v Detroit Edison Co,* 42 Mich App 477, 480; 202 NW2d 431 (1972), *lv den,* 389 Mich 757 (1972), although involving buried electric cables, said that Edison had a duty:

"to warn persons legally on the premises doing any of the kind of digging that could reasonably be expected to be performed on that type of a development."

In the instant case, Edison had a duty at least to warn persons legally on the premises, doing any kind of work that could reasonably be expected to be performed near the lines, of the danger involved. Although the lines in the instant case were "overhead and readily observable", as in *Koehler, supra,* and as noted in *Hobbs,* 42 Mich App 477, 481, Mr. Hill, plaintiff's decedent's employer, testified that the wires were so thick that he thought they were insulated and that there was no danger. We note the rule that "summary dispositions of negligence cases are to be employed only in the clearest cases". *Schulte v Detroit Edison Co,* 50 Mich App 326, 330; 213 NW2d 311 (1973), *lv den,* 391 Mich 774 (1974), citing *Davis v Thornton,* 384 Mich 138; 180 NW2d 11 (1970), and find that this was not one of those "clearest cases". The trial court did not err in denying Edison's motion for a directed verdict.

Likewise, the trial court did not err in denying

Edison's motion for directed verdict on the grounds that the evidence was insufficient to show that it was a "volunteer", and that it had not sanctioned an unsafe condition. Citing 2 Restatement Torts, 2d, § 324A, p 142, Edison argues that the rule that one who assumes to do something must act reasonably in doing so does not apply unless plaintiff was able to show reliance upon Edison's inspection.

*Ray v Transamerica Ins Co,* 46 Mich App 647, 656–657; 208 NW2d 610 (1973), held that the above Restatement citation governed a "volunteer-inspector" situation. That rule is:

"One who undertakes, gratuitously or for consideration to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a) his failure to exercise reasonable care increases the risk of harm, or

"(b) he has undertaken to perform a duty owed by the other to the third person, or

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking." 46 Mich App 647, 657.

*Ray* noted that the above rule provided for "three alternative theories of recovery". One does not have to prove a combination of theories or all of them; "proof of either theory is a valid basis for recovery". 46 Mich App 647, 657. Although *Ray* said that reliance was a factor to be considered when subsection (b) is at issue, 46 Mich App 647, 657–658, the instant case seems to fall more within subsection (a), and we find that the evidence was sufficient to present a question for the jury as to whether Edison exercised reasonable

care, and if not, whether that increased the risk of harm to plaintiff's decedent. In any event, if reliance is to be a factor to be considered regardless of which subsection is involved, as perhaps indicated in *Watson v Employers Ins Co of Wausau,* 50 Mich App 597, 602; 213 NW2d 765 (1973), a view of the evidence favorable to plaintiff shows that perhaps Wilhelm relied upon the absence of a warning sign and the thickness of the wires as indications that he could safely paint around the wires. Although there was evidence to the contrary, namely, other painters stating that they would not paint near power lines, we find that the evidence was sufficient to present a question for the jury. Among the cases cited by Edison for its assertion that reliance must be proven is *Northwest Airlines, Inc v Glenn L Martin Co,* 224 F2d 120 (CA 6, 1955). However, unlike Edison, the court noted there that Northwest did not participate in the design of the portion of the airplane wing that failed, nor did Northwest decide upon any of the specifications involved therein. 224 F2d 120, 127. Edison, on the other hand, furnished "XPC drawings", and was involved in the planning and design of the electrical installation.

Edison's argument that the jury should not have been instructed that they could find Edison negligent if it had sanctioned an unsafe condition is without merit in view of the above. Also, we note that Edison's counsel failed to object to this jury instruction, and thus Edison's objection to the instruction has not been preserved for appellate review. *Hunt v Deming,* 375 Mich 581, 584–585; 134 NW2d 662 (1965), and GCR 1963, 516.2.

The Mall argues on appeal, as it did below in the course of its motion for directed verdict and for judgment notwithstanding the verdict, that it

owed no duty to plaintiff's decedent, that it was not bound to insulate or de-energize the lines, or provide a warning to Mr. Wilhelm, and that it further had no duty to protect Wilhelm against a risk which was intimately connected "with the defects of the premises which the contractor had undertaken to repair". The Mall cites 31 ALR2d 1375, § 2, p 1381, for the latter assertion. Cited therein is the case of *McDade v West,* 80 Ga App 481; 56 SE2d 299 (1949), which the Mall also cites. However, the above source noted that *McDade, supra,* was one of the "few" cases in which it has been held that the exception to the "safe place" doctrine was applicable to a situation involving painting. It stated:

"In most of the cases the general rules of the law in negligence prevailing in a particular jurisdiction have been applied in determining whether the contractee is or is not liable for injury or death of a painting contractor or one of the latter's employees." 31 ALR2d 1375 § 5, p 1388–1389.

Also, this exception to the "safe place" rule would not apply because Wilhelm was not engaged in repairing the electrical installation or the electric wires, but was instead painting near those wires. He was not attempting to "repair" any alleged defect in the electrical system. Keeping in mind our task to view the evidence in a light most favorable to plaintiffs, *Mackey v Island of Bob-Lo Co,* 39 Mich App 64, 65; 197 NW2d 151, 152 (1972), we will now examine the balance of the Mall's argument.

The Mall, owner not only of the building but also of the electricity which it had purchased from Detroit Edison for resale to its tenants, entered into a contract with the I.H. Hill Company, Mr.

Wilhelm's employer. *Thompson v Essex Wire Co,* 27 Mich App 516, 524; 183 NW2d 818 (1970), said:

"In 18 Callaghan's Michigan Civil Jurisprudence, Negligence, § 10, pp 215–217, it is stated in part as follows:

" 'The owner of premises is under a duty to use such care as an ordinarily careful and prudent person uses under the same or similar circumstances to avoid injury to invitees. * * * While one in lawful control of premises is not an insurer of safety of an invitee, if the proprietor knows or reasonably should know of a dangerous condition on his premises, he may become liable for an injury resulting therefrom, and he may not delegate his responsibility to another, and thus escape liability.'

\* \* \*

" '[W]hoever expressly or impliedly invites others upon his premises assumes the duty of warning all who may accept the invitation of any danger in coming, of which he knows or ought to know, but of which they are not aware.' "

*Kirner v General Motors Corp,* 41 Mich App 211, 213; 199 NW2d 827 (1972), said that an owner had a duty to warn an invitee, contractor or subcontractor performing services on the premises of hidden defects or dangerous conditions located therein. Citing *Dees v L F Largess Co,* 1 Mich App 421, 136 NW2d 715 (1965), *Kirner, supra,* noted an exception to this rule, situations in which "the condition or defect is obvious to the contractor or invitee * * * ". 41 Mich App 211, 213. We stated earlier that Mr. Hill, Wilhelm's employer, did not think that the danger was obvious, stating that he felt the wires looked to be insulated. On the Saturday previous to beginning the painting job, Wilhelm was shown the job site by Mr. Hill, and the evidence does not show that Wilhelm knew any

more than his employer had learned, or had failed to learn, of the nature of the danger.

The Mall also refers to *Koehler, supra,* and *Dees, supra,* to support its conclusion that it lacked the obligation to de-energize or insulate the lines or warn plaintiff's decedent of the dangerous condition. Perhaps even more so than Edison, the Mall's reliance upon these cases is misplaced. Rather than requiring the Mall to protect plaintiff's decedent from a "fortuitous contact" with the electric line, our affirmance of the trial court's decision merely holds the Mall to the duty to exercise reasonable care in light of the circumstances. The Mall had a contract with Wilhelm's employer in which it was specifically stated that the metal trim was to be painted. The Mall obviously knew that some of this trim was located quite near the power lines. Unlike the owner of the electricity in *Carr v Detroit Edison Co, supra,* the Mall obviously knew of the painting activity being carried on "in close proximity to the lines", and we have seen that the evidence fails to disclose that Wilhelm was "admittedly well aware" of the hazard involved. 49 Mich App 332, 340.

*Gunn v Edison Sault Electric Co, supra,* has previously been distinguished, and the Court is unpersuaded that it, as well as the *Dees* and *Koehler* cases, require reversal. Although *Katz v Arundel-Brooks Concrete Corp,* 220 Md 200; 151 A2d 731 (1959), used the "obviousness" of the danger of uninsulated high tension lines as an example of when a warning from an owner is unnecessary, Mr. Hill, with whom Wilhelm had examined the job site, testified that the danger was not obvious. Mr. Murray, a fellow painter, said that he painted quite often around electric wires, and that they were generally marked as

dangerous or he is generally told to avoid going near them. However, no such warning or verbal advise was provided in this case. Although Murray later stated that he would not have touched the wires deliberately despite the absence of a warning, we find that the evidence was such as to allow the jury "to find that defendant breached its duty to exercise reasonable care to protect plaintiff-invitee from injury". *Kucken v Hygrade Food Products Corp,* 51 Mich App 471, 474; 215 NW2d 772 (1974). Thus, denial of the Mall's motion for directed verdict and judgment notwithstanding the verdict was proper.

II. *Was plaintiff's decedent contributorily negligent as a matter of law?*

Both defendants argue that the danger of working near the electric wires was so obvious that plaintiff's decedent was contributorily negligent, and that the trial court should have granted their motions for directed verdict on this basis. We must once again view the evidence in a light most favorable to plaintiff when reviewing the trial court's denial of defendant's motion for directed verdict. *Misiulis v Milbrand Maintenance Corp,* 52 Mich App 494, 508; 218 NW2d 68, 75 (1974).

This is a wrongful death case. MCLA 600.2922; MSA 27A.2922. Plaintiff's decedent died by electrocution, and there were no eyewitnesses to his death. Thus, "he was presumed to have been in the exercise of due care for his safety". *Jordan v Whiting Corp (On Rehearing),* 49 Mich App 481, 485; 212 NW2d 324 (1973), *lv granted,* 391 Mich 771 (1974). While defendants are correct when they assert that this presumption may be rebutted by circumstantial evidence, defendants may prevail only when such evidence will "' * * * lead to

[the] inevitable conclusion by all reasonable minds that the decedent was contributorily negligent' ". [Citation omitted.] *Miller v Hall,* 45 Mich App 28, 32; 205 NW2d 825 (1973). *In re Blackwell Estate,* 50 Mich App 204, 226; 213 NW2d 201 (1973), *reversed on other grounds,* 391 Mich 798 (1974), in the course of stating that the trial court did not err in submitting the question of contributory negligence to the jury, said:

"The presumption of due care can be overcome where physical facts in evidence * * * might demonstrate that the plaintiff's decedent failed to exercise reasonable care."

*Mackey v Island of Bob-Lo Co,* 39 Mich App 64, 66; 197 NW2d 151 (1972) said that the fact that plaintiff "was aware of the danger does not make her actions contributorily negligent as a matter of law". *Ray v Transamerica Ins Co,* 46 Mich App 647, 655; 208 NW2d 610 (1973), repeated the rule that "awareness of the danger is not by itself sufficient for a finding of contributory negligence as a matter of law" citing *Pigg v Bloom,* 22 Mich App 325; 177 NW2d 441 (1970), and said that unless "all reasonable men" would have to agree that plaintiff was contributorily negligent, the question should be left for the jury's determination.

*Clumfoot v St Clair Tunnel Co,* 221 Mich 113, 118; 190 NW 759 (1922), involved the assertion that plaintiff, who came in contact with some high voltage wires, was contributorily negligent. Referring to *Teachout v Grand Rapids, G H & M R Co,* 179 Mich 388; 146 NW 241 (1914), *Clumfoot* said:

"To give rise to this defense, however, it must be shown that plaintiff, in coming in contact with the appliances [or wire], voluntarily and unnecessarily ex-

posed himself to danger, and if reasonable men might honestly differ on the question, the court will not hold plaintiff guilty of contributory negligence as a matter of law."

Although some of the painters on Wilhelm's crew testified that they would not have touched the electric wires, Mr. Hill, with whom Wilhelm had examined the job site, said that he thought that the electric wires were insulated due to their thickness. Mr. Murray, the other foreman on the job, testified that he did not really consider the wires to be dangerous because of the absence of a cage or a warning sign. Although he also said that he would generally avoid touching such wires deliberately, a view of the evidence favorable to plaintiff leads us to conclude that all reasonable men could not "inevitably conclude" that plaintiff's decedent was contributorily negligent. The trial court properly allowed this issue to go to the jury, and therefore committed no error in failing to grant defendants' motions for directed verdict. Even in *Koehler,* in which the court said that all of the ironworkers had fully understood the danger of the electric wires, and in which the wires were quite obvious to all parties, the conduct of plaintiff's decedent was a question of fact for the jury to determine. 383 Mich 224, 233–234.

III. *Did the trial court erroneously exclude testimony of a warning of the danger of the wires and safety regulations prohibiting the use of metal ladders near electric lines?*

Defendants argue that the trial court erred in excluding the testimony of James Lantto, who was an apprentice painter and a member of the crew of which ·Wilhelm was the foreman on the day he

met his death. Defendants argue that Lantto should have been allowed to testify that he had been told by one of the foremen not to paint near the electric lines. A close reading of the record belies the contention that the jury failed to hear this evidence.

Mr. Murray, who was also employed as a foreman for the I.H. Hill Company at the time of the accident, testified that he did not work on the job at the Mall, but stated that he had taken all of the equipment to the job site. In response to defense counsel's question, he stated that he had never talked to Mr. Lantto during the course of the Mall project, and had never told Lantto to stay away from the electric wires. Lantto, on the other hand, said that either Mr. Murray or Wilhelm had told him of the presence of the wires. Plaintiff's counsel objected on the grounds that this was hearsay, and that Lantto was unable to identify which person had warned him of the electric lines. Lantto then said that one of the foremen had told him, and that he was not sure which one. After Lantto stated that he could not remember which person had advised him of the power lines, the jury was excused and a separate record was made as to the admissibility of Lantto's testimony. The trial judge then ruled that this testimony should be excluded. However, when the jury was returned to the courtroom, the trial judge failed to instruct the jury to disregard Lantto's previous testimony, and the record fails to reflect an order striking that testimony.

Lantto continued to testify, stating that he "believed" that Wilhelm was the foreman on the day in question, that shortly before the accident Wilhelm told Lantto to go up onto the roof to assist another painter, and Wilhelm continued painting the trim from that point until he was electrocuted.

Lantto was then asked if he had received instruction not to paint around the electric wires. Plaintiff's counsel then asked "Aren't we right back to the area where we were; deliberately?" The trial judge said "He can answer that question". Lantto then affirmatively replied to defense counsel's question as to whether Lantto had received any instructions about not painting around the wires. He then said that Murray and Wilhelm were the two foremen, and that he could not recall whether they were on the job together.

Defense counsel continued to question Lantto, asking "You received explicit instructions about not going near the wires?" Lantto replied "I was told not to go near the wire cage on the roof". He then identified exhibit 11 as the "wire cage" which he was talking about, said exhibit being a photograph of the two wire fences and the respective electrical installations near which Wilhelm was electrocuted. On cross-examination, plaintiff's counsel asked whether the wire cage, enclosing a group of electric wires behind the Kroger store, exhibit 19, was the cage of which Lantto was speaking. He said that he was unable to recall the door, but "sort of recalled" that cage. Lantto vacillated as to whether he and/or the wires and/or the cage were on the roof, was unable to affirmatively state whether Murray or Wilhelm had spoken to him, and said, "he says, whoever told me, he said that I was to stay away from them".

The foregoing summary of the transcript reveals that the jury was in fact informed that either Murray or Wilhelm had told Lantto not to paint near the wires and defendants' argument to the contrary is without merit. In any event, Lantto exhibited some confusion as to the precise location and description of the wires of which he was

advised, and perhaps the only prejudice encountered by defendants in this episode was the admission, rather than the alleged exclusion, of his testimony.

The Mall argues that the trial court erred in excluding evidence of safety regulations prohibiting the use of metal ladders near electrical lines. Among other things, the Mall argues that it was deprived of the use of this evidence in its argument to the jury. At the outset, we note that defense counsel, although unable to rely upon the regulation, argued in his closing argument that Mr. Wilhelm was contributorily negligent in his use of an aluminum ladder near the electrical lines, and that common sense dictated that one should not put metal around electricity.

During the course of trial, 1964–1965 AACS, R 408.2204 was read to the jury. That rule states in part:

"All metal ladders are electrical conductors. Metal ladders shall not be used around electrical lines or conductors."

Subsequent to its admission, plaintiff's counsel voiced an objection on the grounds that it was irrelevant to the case, the trial court so found, and instructed the jury that this rule was inapplicable to a maintenance rather than a construction situation. The general rules of the Construction Safety Commission, including Rule 1204 quoted above, were promulgated pursuant to the Construction Safety Act of 1963, MCLA 408.711 *et seq.;* MSA 17.469(1) *et seq.,* and in particular MCLA 408.717; MSA 17.469(7). According to MCLA 408.712(b); MSA 17.469(2)(b) (as it then read):

" 'Construction industry' means construction firms

and contractors (but not including firms or companies, whose principal business is other than construction work, and whose construction work consists only of maintenance construction work performed on their own property by their own employees) whose classification as construction industry is in accordance with the standard industrial classification manual prepared by the technical committee on industrial classifications, office of statistical standards, 1957 edition, and who are subject to the workmen's compensation law other than by voluntary assumption of the law."

The manual cited above was referred to in *Carr v Detroit Edison Co,* 49 Mich App 332, 335–336; 212 NW2d 70 (1973). It notes that "the term 'construction' includes new work, additions, alterations, and repairs". The types of construction activity covered was said to be building construction by general contractors, other construction by general contractors, and construction by special trade contractors. 49 Mich App 332, 336.[2] The I. H. Hill Company, a painting contractor, entered into a contract with the Mall to paint certain areas of the Mall's building. The contract was signed by Mr. Mudloff, apparently the person in charge of maintenance at the Mall. Was the trial court correct in finding that the rules applicable to the "construction industry" did not apply to Mr. Wilhelm and his employer?

*Waters v Lakewood Utilities Co,* 203 Mich 166, 171; 168 NW 1021 (1918), defined the word "construction" as follows:

"To construct is to bring together, to put together, the constituent parts of something in their proper place and order; to build; to form; to make; as, to construct an edifice. Synonyms are, to build; to erect; form; compile;

---

[2] The manual includes within its classifications Industry No. 1721, Group No. 172, "Special trade contractors primarily engaged in interior and exterior painting of buildings * * * ". Manual, p 38.

make; fabricate. Construction means the process or act of constructing, the act of building; erection; the act of devising and forming; fabrication; composition. *Vide* Webster's Inter. Dict."

The Hill Painting Company was not hired to build the metal trim, nor was it hired to "erect, form, compile, make, or fabricate" anything on the Mall's building. It was merely hired to paint certain portions of the building, and was specifically excluded from painting in an area "where they (the Mall) anticipated an alteration job * * * ". Hill was told "Don't paint that and other areas similar". Certain areas "were not to be painted because they were going to increase in size or something to that effect".

As indicated in *Carr, supra,* the standard industrial classification manual seemed to indicate that "repairs" were included in the definition of construction. *Attorney General ex rel Gibson v Board of Supervisors of Montcalm County,* 141 Mich 590, 597; 104 NW 792 (1905), noted the difficulty of determining "the dividing line between repairs and new construction * * * ". The Court noted that these words should be given their ordinary meaning, and referred to a number of definitions of the word "repair". Words such as restore, mend, refit and "make good" were found to be synonyms for the word repair. The Court also noted that the general rule seemed to be that repair did not imply "the power to rebuild or reconstruct". 141 Mich 590, 597–599. *Walker v Detroit,* 143 Mich 427, 430; 106 NW 1123 (1906), referred to a general definition of repair, and noted "thus the term does not include construction, reconstruction, or rebuilding".

In Michigan, the word "construction" does not include "repair". The determination of "the rele-

vancy of the proffered evidence" is within the "reasonable discretion" of the trial judge, and appellate courts generally do not "second-guess such judgment. They should intervene only when clear abuse is shown." *People v Howard,* 391 Mich 597, 603; 218 NW2d 20 (1974). See also *People v Hodo,* 51 Mich App 628, 638; 215 NW2d 733 (1974). The Hill Painting Company was not part of the construction industry, was excluded from the operation of the Construction Safety Act, MCLA 408.712(b); MSA 17.469(2)(b), and therefore the prohibition against using metal ladders near electric lines was inapplicable to the Hill Company and its employee, Mr. Wilhelm. We find no abuse of discretion by the trial court in excluding this evidence.

In any event, a finding that Hill and/or Wilhelm had violated the safety rule would only be evidence of negligence, and would not establish that Hill was contributorily negligent as a matter of law. *Price v Manistique Area Public Schools,* 54 Mich App 127, 131; 220 NW2d 325, 328 (1974). There is no dispute at trial that Wilhelm had used an aluminum ladder, and defense counsel referred to this fact in the course of his final argument to show that Wilhelm was negligent. In light of this and the absence of an abuse of the trial court's discretion, our Court's refusal to find reversible error is not "inconsistent with substantial justice". GCR 1963, 529.1.

IV. *Did the trial court abuse its discretion in admitting testimony from the plaintiff's two expert witnesses regarding the safety of the protective fence and the electrical installation?*

Melvin Sachs, a registered architect with Sachs,

Freid and Associates, and Professor John J. Carey, a registered professional engineer and a professor of electrical engineering at the University of Michigan, offered their opinions as to the relative safeness of the electrical installation and protective fence which together comprised the setting for the electrocution of Mr. Wilhelm. The Mall argues that their testimony should have been excluded on the grounds that the opinions of a registered architect and registered electrical engineer would tend to establish a standard of care for specialists in those respective fields, and that this standard of care is inapplicable to the Mall. Edison argues that Mr. Sachs' testimony was irrelevant to Edison's duty to Mr. Wilhelm, and that Carey had assumed that the metal trim needed painting every two to four years, although Edison states that it lacks such knowledge. Both defendants argue that the testimony of both experts should have been excluded in light of the principles announced in *O'Dowd v Linehan,* 385 Mich 491, 509–510; 189 NW2d 333 (1971), in particular the third requirement that there must be knowledge in a particular area that belongs more to an expert than to the common man so as to allow that expert to testify. Defendants argue that the testimony at issue improperly invaded the province of the jury, especially as far as the alleged violation of some Michigan Public Service Commission rules was concerned. Defendants also argue that evidence of what could have been done to make the installation and fence safer should have been excluded on the grounds that evidence of what could have been done to make something safer is generally inadmissible, citing *Warner v Kewanee Machinery & Conveyor Co,* 411 F2d 1060 (CA 6, 1969), and *Fisher v Johnson Milk Co Inc,* 383 Mich 158; 174 NW2d 752 (1970).

*O'Dowd v Linehan, supra* and *People v Zimmerman,* 385 Mich 417; 189 NW2d 259 (1971), involved the test to be applied regarding the admissibility of expert testimony. At issue is the requirement in *O'Dowd, supra,* that "there must be knowledge in a particular area that belongs more to an expert than to the common man". 385 Mich 491, 510. *Zimmerman, supra,* involved three opinions, and apparently spoke of the "necessity" test, namely, whether or not the jury could "get along" without the expert testimony and the "value" test, which is concerned with the experience of the expert and its bearing upon his opinion. *Friedman v Farmington School District,* 40 Mich App 197, 205; 198 NW2d 785 (1972), said that "the application of the two tests is properly left to the common sense and discretion of the trial court".

Sachs testified that based upon his experience and knowledge, the erection of a safety fence only 1/2 inch, rather than 4 inches as called for in the plans, away from the wall, made this an unsafe condition in that a man could not paint the metal trim from the roof, and that a person in Mr. Wilhelm's position had to use a ladder and stand near the uninsulated wires which met the building shortly below the metal trim. He said that safety is a "prime consideration" in the planning of any construction project, and that the Mall and its architect had three alternatives to make this a safer situation. First, it could have provided sufficient space between the wall and the fence so that one could paint the metal trim from the roof without having to be where Mr. Wilhelm was. Second, the Mall could have provided a flashing that would not require painting. Third, the Mall could have provided the electrical service underground. Sachs said that upkeep and maintenance

are always considered at the planning stage of a construction project, and we find that Sachs' testimony did not tend to establish a duty higher than that to which the Mall was already bound, but merely went to the question of foreseeability and reasonable care in the circumstances. Likewise, his testimony as far as Edison was concerned related to the question of whether Edison exercised and observed a standard of care in proportion to the danger involved. *Clumfoot v St Clair Tunnel Co, supra.* The trial court properly exercised its discretion in allowing the introduction of this testimony.

Professor Carey referred to three Michigan Public Service Commission rules in the course of his testimony, and offered the opinion that the Mall should have requested the power be turned off or that a warning be given, and that Detroit Edison should have either insulated the lines, provided underground electrical service, or connected the lines to the building by means of an aerial cable. It was his opinion that good practice was not followed in this situation.

The Michigan Public Service rules referred to by Professor Carey were the following:[3]

(1) 1966 AACS, R 460.541(211)—"Installation and maintenance. All electrical supply and communication lines and equipment shall be installed and maintained so as to reduce hazards to life as far as practicable."

(2) 1966 AACS, R 460.540(200) C.—"Conformity with good practice. Construction should be made in accordance with accepted good practice for the local conditions and all particulars not specified hereafter."

(3) 1966 AACS, R 460.541(210)—"Design and Construction. All electric supply and communication lines and equipment shall be of suitable design and construc-

---

[3] Professor Carey testified that the substance of these three 1966 Rules was applicable in 1964, although this was not an issue.

tion for the service and conditions under which they are to be operated."

Defendants argue that an opinion as to whether the above rules are violated contravenes the policy of *O'Dowd, supra,* that this was not an area in which expertise could properly function. The question of whether there has been a violation of the rules is said to be one within the knowledge of the common man.

*Friedman, supra,* affirmed the exclusion of expert testimony as to the proper janitorial and maintenance services involved in that case. The Court felt that janitorial service, namely, the washing of a floor and the resulting slippery conditions, was within the common knowledge and experience of ordinary people. *Friedman, supra,* however, referred to *Great American Ins Co v Michigan Consolidated Gas Co,* 13 Mich App 410, 417; 164 NW2d 575 (1968), which said that facts regarding the ignition of gas or gasoline are generally beyond the common knowledge and that the testimony of an expert on the subject would "aid the jury in reaching a proper conclusion". 40 Mich App 197, 205. Architectural planning for maintenance and safety of maintenance workers as well as the installation of electrical service are areas which are generally beyond the common knowledge of ordinary people. Such activities are more akin to the "ignition of gas or gasoline" situation rather than the "janitorial service" situation. Unlike *In re Blackwell Estate,* 50 Mich App 204, 215; 213 NW2d 201 (1973), *reversed on other grounds,* 391 Mich 798 (1974), there were facts presented in evidence which required and were subject to examination and analysis by the experts, and the requirements of *O'Dowd, supra,* were met.

The Mall cites *Kapalczynski v Globe Construc-*

*tion Co,* 19 Mich App 396, 402–403; 172 NW2d 852 (1969), stating that there is no basis for distinguishing between a products liability and a contractor's liability case, and that the former will provide assistance to our Court, which is concerned with the latter. *Fisher v Johnson Milk Co Inc, supra,* a products liability case, adopted a rule that a manufacturer has no obligation to make his product accident-proof or fool-proof, and held that defendant therein had no legal duty to design and provide a milk bottle carrier so as to prevent bottles contained therein from breaking when the carrier was dropped to a hard surface. 383 Mich 158, 162–163. *Warner v Kewanee Machinery, supra,* involved the allegation that a portable farm elevator could and should have been designed differently so as to be safer. The court noted that plaintiff had failed to present evidence sufficient to create a jury question, and applied the rule that evidence of what is thought by some to be a safer design or a safer method is generally inadmissible. 411 F2d 1060, 1066. *Grant v National Acme Co,* 351 F Supp 972, 977 (WD Mich, 1972), while acknowledging that a manufacturer did not have to "produce a foolproof, or even safer, product", said there remained the issue as to whether reasonable men could find that the machine "was reasonably designed to protect its user against reasonably foreseeable risks of harm". If the injury is reasonably foreseeable, the jury must determine if the manufacturer should have installed a safety device. *Coger v Mackinaw Products Co,* 48 Mich App 113, 122; 210 NW2d 124 (1973). Although the issue is a close one, we find that the expert testimony was introduced not to show what some had thought to be a "safer design or method" of electrical installation, but rather was admissible

to show whether defendants had acted reasonably to protect against reasonably foreseeable risks of harm.

Unlike *Fisher, supra,* the instant case does not involve a "simple tool", 48 Mich App 113, 122, but instead involves three uninsulated high tension lines carrying 4800 volts which meet a building shortly below some metal trim. Although factually different, *Byrnes v Economic Machinery Co,* 41 Mich App 192, 200–201; 200 NW2d 104 (1972), *lv den,* 388 Mich 765 (1972), and its reference to the rule that "liability can be predicated on a safety device's failure to work under some conditions", applies to our case. Also, *Wayne-Oakland Bank v Adam's Rib,* 48 Mich App 144, 148; 210 NW2d 121 (1973), *lv den,* 390 Mich 796 (1973), noted that "the jury could consider the *omission* of such known safety devices improper", and we find that the expert testimony was properly admitted and was relevant to both defendants' duty to use reasonable care in the circumstances. Unlike *Warner, supra,* there was adequate evidence to go to the jury on the questions of reasonable care and foreseeability. In view of the above, the trial court did not abuse its discretion in admitting the expert opinions of Sachs and Carey.

V. *Jury Instructions*

Six separate alleged errors in jury instructions, either by commission or omission, are assigned by defendants Edison and Mall. Our review discloses no reversible error but, succinctly, we discuss each.

1. *Did the trial court err in instructing that defendant Edison owed decedent a "high degree of care"?*

The phrase "high degree of care" was used by the

court. Had it stood alone and unqualified it probably would have amounted to reversible error. See *Felgner v Anderson,* 375 Mich 23, 30; 133 NW2d 136 (1965). However, the court proceeded to explain this meant reasonable care under the circumstances of the case. The trial court's instruction closely parallels *Frederick v Detroit,* 370 Mich 425, 427–429; 121 NW2d 918 (1963), where, after first employing the words "a higher degree of care" the trial court then went on to explain this means due care under the circumstances. We conclude that no error was committed and, additionally, note that defendant Edison did not object to the charge.

2. *Did the trial court err in its instructions removing assumption of risk from the jury's consideration?*

As part of its instructions on contributory negligence, the trial court included instructions on assumption of risk. When the jury retired, plaintiff's counsel objected and counsel for Edison objected because of the omission of his requested instruction 9. Whereupon the jury was returned to the courtroom and the trial judge gave instruction 9 and also removed assumption of risk from the jury's consideration. Defendants contend the corrected instruction on assumption of risk constitutes error because the jury could not distinguish between contributory negligence and assumption of risk. Counsel claim the corrected instruction removed both assumption of risk and contributory negligence from jury consideration.

Reading the instruction as a whole, we do not find that the corrective addition removed from the jury consideration the issue of contributory negligence. The supplemental instruction was a correct statement of law. Assumption of risk has been

abolished in Michigan. *Felgner v Anderson, supra; Bumstead v Bucht,* 4 Mich App 4, 7; 143 NW2d 789 (1966).

3. *Did the trial court err in refusing to give Edison's requested instruction number 4?*

Requested instruction number 4 concerned reference to Edison's specifications for electrical work appearing in exhibit 25 which was introduced in evidence upon stipulation of all parties. These references were in writings between the Mall, its engineers and architect and to which Edison was not a party. Edison requested an instruction to disregard any statements as to Edison requirements contained in the writings but, in lieu thereof, the trial court instructed the jury that Edison was not to be charged thereunder unless the jury found Edison had knowledge and approved or sanctioned the same. We do not agree with Edison that under the authority of *Colgrove v Goodyear,* 325 Mich 127; 37 NW2d 779 (1949), the instruction was prejudicial error. That case dealt with the admissibility of the document in question, whereas in the instant case the document was received in evidence by stipulation. Further, Edison did not object to the modified charge as given and, under GCR 1963, 516.2, cannot raise the issue on appeal.

4. *Did the trial court err in refusing to give verbatim Edison's requested instruction 9?*

Following Edison's objection to the failure to give its requested instruction 9, the trial court gave the instruction verbatim except that the court omitted the words "and guarded" and added a comment "there are other claims of negligence in this case". The trial court's modification is justified since

some evidence is found in the record that the wiring leading to the Mall building was not adequately guarded according to electrical code provisions. The instruction as given left the issue of guarding open and this in turn became a claim of negligence referred to in the addition of the comment made by the court. Further, Edison did not object to the modified charge as given and, under GCR 1963, 516.2, cannot raise the issue on appeal.

5. *Did the trial court err in instructing that damages could be awarded plaintiff for loss of love and companionship?*

During trial, the court ruled that plaintiff could not include, as part of the children's damages, loss of the father's society or companionship.[4] Yet, in its instructions the court included as an element of damage loss of the father's "love, affection, companionship". The defendant Edison contends that in light of the court's earlier ruling on evidence the jury instruction was inconsistent and confusing and under *Heiman v Kolle,* 317 Mich 548; 27 NW2d 92 (1947), a new trial is mandated. We find just the reverse. The court's ruling on evidence was wrong and the instruction was correct. *Breckon v Franklin Fuel Co,* 383 Mich 251; 174 NW2d 836 (1970), was overruled by *Smith v Detroit,* 388 Mich 637, 649; 202 NW2d 300 (1972). Loss of companionship is an element of damage under the wrongful death act even though injury occurred prior to the amendment.[5] Again we observe Edison did not object to the modified charge

---

[4] Plaintiff argued the amendment MCLA 600.2922; MSA 27A.2922 was procedural and under *Lahti v Fosterling,* 357 Mich 578; 99 NW2d 490 (1959), could be applied retroactively. The trial court disagreed, holding that the amendment gave a new cause of action for recovery for loss of society and companionship and therefore only applied to injuries sustained after its effective date, March 30, 1972.

[5] 1971 PA 65.

as given and under GCR 1963, 516.2, cannot raise the issue on appeal.

6. *Did the trial court err in failing to give defendant Mall's requested instruction number 2?*[6]

Instruction 2, set forth in its entirety with counsel's citations in the footnote, basically denies the Mall's duty to supply a safe place to work to independent contractors. An alternate and less sweeping instruction 2, also submitted by counsel for the Mall, was given substantially verbatim. While the rule as set forth in the requested instruction is still applicable under standard conditions, it is not applicable in the situation involved in the instant case where the independent contractor is employed to work under conditions involving special danger to others. As noted, *McDonough v General Motors Corp,* 28 Mich App 7; 183 NW2d 904 (1970), cited by the Mall, was reversed. A majority of the Court found that the work conditions involved an inherently dangerous activity and that the prevailing Michigan rule as set forth in 2 Restatement Torts 2d, § 416 and § 427, pp 395 and 415, should be followed. Alternate instruction 2 given by the trial court paralleled the Restatement rule. In our opinion, unguarded high voltage

---

[6] I charge you ladies and gentlemen that a property owner who contracts to have work performed on his property by an independent contractor and his employees, and who does not retain control over the methods and procedures of the subcontractor, does not have an affirmative legal duty to protect an employee of the subcontractor from injury caused by the use by the subcontractor of his equipment, or by the employee's work methods because a property owner is not required to substitute its judgment for that of the subcontractor or its employees who hold themselves to be proficient in their area of work. *McDonough v General Motors Corp,* 28 Mich App 7 [183 NW2d 904 (1970)]; *Funk v General Motors Corp,* 37 Mich App 482 [194 NW2d 916 (1972)]; *Lenderink v Village of Rockford,* 135 Mich 531 [98 NW 4 (1904)]. We note that *McDonough, supra* and *Funk, supra,* were reversed, 388 Mich 430; 201 NW2d 609 (1972), and 392 Mich 91; 220 NW2d 641 (1974).

wires entering a wall a few inches from metal trim to be painted by an employee of an independent contractor and without the posting of warning signs visible from the employee's position presents a more dangerous working condition than the operation of the crane involved in *McDonough, supra.* The trial court was correct in rejecting the instruction.

VI. *Did the trial court err in granting the third-party defendants' motions for summary judgment?*

Our opinion sustains the jury verdict of $325,000 against defendants Edison and Pontiac Mall. Remaining is the issue of whether the three third-party defendants should share with defendant Mall the Mall's portion of liability. Determination of this question will not affect plaintiff's verdict or Edison's liability. It only affects Pontiac Mall's obligation by potentially compelling—should the jury so determine—the third-party defendants to share in the Mall's liability.

The essential facts in the Mall's third-party complaint are set forth in the first part of this opinion. The complaint requested indemnity "and/or contribution". The trial court first granted the motions for a directed verdict in favor of Walter Couse Company and Ornamental Iron Company, assigning two reasons for its decision. First, the court stated the 1961 fencing had been inspected by the Mall and approved. The defect was not hidden or undiscoverable by inspection. The court acknowledged that the case of *Kapalczynski v Globe Construction Co,* 19 Mich App 396; 172 NW2d 852 (1969), abolished the "accepted work" defense but stated such holding was not applicable to the present case since no third person was

involved and the suit was brought by the parties to the original contract. Second, the court observed that to be a proximate cause, the subsequent injury must be one which, in the light of attending circumstances, should have been reasonably foreseen. The court doubted that it was reasonably foreseeable that because fence #1 had been constructed in a certain manner, some three years later some other person would build a fence just like it. Accordingly, the court found that if there was negligence in the construction of fence #1, it was not the proximate cause of the injury occurring at fence #2.

The motion for a directed verdict in favor of Harlan Electric Company was also granted, the court repeating the first reason given for granting summary judgments to Couse and Ornamental Iron. Again the court commented that the claim was between the parties to the contract and that a third party had not intervened. In an apparent reference to the fact that the blueprint for construction of fence #2 carried the notation "fence to match existing—including painting" the court further ruled that it appeared to be undisputed that, as to the second fence, the plans were carried out.[7]

To the extent that the trial court action rejected the third-party complaint for indemnity, we agree.

---

[7] *"Mr. Watters:* Did you rule—You said it was undisputed that the plans and specifications were carried out. Does that mean you find that the fence as constructed was in conformity with the plans and specifications?

*"The Court:* I think so.

\* \* \*

*"The Court:* I have already ruled, it was between these parties, it was in the plans and specifications. You having directed it be built like the other fence now—

*"Mr. Watters:* I see, you are saying the language on there 'match the existing fence' superseded the dimension as a matter of law is that—"

Common-law indemnity is intended only to make whole again a party held vicariously liable to another through no fault of its own. Obviously, for the reasons set forth in paragraph I, the Mall could not prove an absence of negligence. We disagree with the trial court as to contribution. Contribution is a statutory right. MCLA 600.2925; MSA 27A.2925. It comes into use where two or more tort-feasors cause a single indivisible injury to a third party. If the third party elects to sue only one of the joint tort-feasors the other tort-feasor may be joined as a third-party defendant.

"The statutory right of action for contribution between joint tort-feasors arises because one tort-feasor pays more than his pro rata share of a joint judgment. The theory is that each tort-feasor, through his tortious conduct, has caused a single indivisible injury to the plaintiff. Plaintiff can look to either or both for relief and is entitled to a full satisfaction from one or the other or both. Under the present rules if plaintiff chooses to sue one tort-feasor, the other tort-feasor can be added as a third-party defendant so that the requirement of a joint judgment is satisfied. The statute seeks to do equity between the tort-feasors by equalizing the loss between them without interfering with the plaintiff's rights." *Morgan v McDermott,* 8 Mich App 260, 264–265; 154 NW2d 576 (1967), *reversed on other grounds,* 382 Mich 333; 169 NW2d 897 (1969).

Had plaintiff joined the third-party defendants in the original action the defense that the work had been completed, inspected and paid for would be of no avail, the "accepted work" doctrine having been abolished in Michigan. *Hilla v Gross,* 43 Mich App 648; 204 NW2d 712 (1972); *Hargis v Dearborn Heights,* 34 Mich App 594; 192 NW2d 44 (1971); *Kapalczynski v Globe Construction Co, supra.* Having been abolished in suits brought by the injured party against each tort-feasor, we believe it is also

abolished in a suit for contribution. It is the same as though the injured third party had joined the independent contractors as parties defendant in the original complaint. We, therefore, respectfully must disagree with the first reason assigned by the trial court for granting summary judgments to the third-party defendants.

This brings us then to the other reasons assigned by the learned trial judge for granting summary judgment. In effect, the court found that, *as a matter of law,* none of the three defendants were tort-feasors. In the case of fence #1, the court found that, *as a matter of law,* Walter Couse Company and Ornamental Iron Company were not tort-feasors since their alleged negligence was not a reasonably foreseeable cause of the accident occurring at another fence some four years later. In the case of fence #2, the court found Harlan Electric Company was not a tort-feasor *as a matter of law* since it had followed the blueprint notation "fence to match existing—including painting".

It is only when all reasonable men must agree on the issue of negligence or contributory negligence that a court may decide a question as a matter of law rather than allowing it to go to the jury. *Brown v Page,* 39 Mich App 50, 52; 197 NW2d 74 (1972). See also *Lover v Sampson,* 44 Mich App 173, 184; 205 NW2d 69 (1972), where the Court said:

"It is well settled that the question of proximate cause is ordinarily a question of fact for the jury 'to be solved by the exercise of good common sense in consideration of each particular case.'"

*Davis v Thornton,* 384 Mich 138; 180 NW2d 11 (1970), relied upon in *Price v Manistique Area Public Schools,* 54 Mich App 127; 220 NW2d 325

(1974), involved the questions of foreseeability and intervening causes. *Davis* reversed the granting of a summary judgment, noting that foreseeability, the remoteness between one's acts and another's injuries, and negligence "should almost always be left up to the jury". 384 Mich 138, 148. *Kubasinski v Johnson,* 46 Mich App 287; 208 NW2d 74 (1973), said that "in all but rare instances" the issues of negligence and proximate cause should be left for the jury's consideration. This Court has recently reversed four summary judgments which had been entered in favor of defendants. *Rowen & Blair Electric Co v Flushing Operating Corp,* 49 Mich App 89, 92; 211 NW2d 527 (1973), *Johnston v American Oil Co,* 51 Mich App 646, 648–649; 215 NW2d 719 (1974), *Hutchings v Dave Demarest & Co,* 52 Mich App 274, 278; 217 NW2d 72 (1974), and *McLaughlin v Consumers Power Co,* 52 Mich App 663, 666–667; 218 NW2d 122 (1974). The most recent case, *McLaughlin, supra,* stated the rule as follows:

"Plaintiff first contends that the trial court erred in granting defendant's motion for summary judgment. We agree. A motion for summary judgment under GCR 1963, 117.2(3), made before trial has commenced, is not to be granted unless it can be said, giving the benefit of every reasonable doubt to the party opposing the motion, that there is no genuine issue as to any material fact. *Rizzo v Kretschmer,* 389 Mich 363; 207 NW2d 316 (1973); *Rowen & Blair Electric Co v Flushing Operating Corp,* 49 Mich App 89, 211 NW2d 527 (1973). When such an issue is found to exist, after reviewing all affidavits filed under GCR 1963, 117.3 and all 'pleadings, depositions, admissions and documentary evidence then filed in the action or submitted by the parties', the case should be allowed to go to trial."

The foregoing rules for the proper determination of questions of negligence, proximate cause, and

summary judgments lead us to conclude that, though the issue is admittedly complex and close, the trial judge erred in the granting of summary judgments. The plans and specifications were carefully prepared to prevent the accident which occurred in the instant case. The claim against Harlan Electric Company raises the question of whether Harlan complied with the contract. Harlan claimed it had complied, and the trial court so found, because across the face of the plans (exhibit 5) were written the words "fence to match existing fence—including painting". The Mall argued that the written words referred to matching the first fence with respect to the same type of materials and esthetically, and did not refer to matching by dimensions since the 4-inch dimension was also a part of exhibit 5. Clearly, this is an issue of fact which, looking at the facts most favorably to the Mall and under the guidelines set forth in *McLaughlin, supra,* should be resolved by a jury. For this reason we hold that the summary judgment in favor of Harlan Electric Company was error.

The claim against Walter Couse Company and Ornamental Iron and Stair Company presents the issue of foreseeability. Foreseeability, measured even in hours or days, is admittedly an inexact science. Projected into four years, as here, it obviously is one upon which judicial minds will differ. Much which appears in the record can be cited to support the findings of the trial court. Nevertheless, we cannot conclude that it was totally unforeseeable that the Pontiac Mall would expand and require additional electrical service. If this were to occur we believe it reasonably foreseeable that new power lines would be required including a protective fence which, for esthetic reasons alone,

would be constructed like the first protective fence. Admittedly, a jury, after hearing all the facts, might conclude that the time span was too great or that the construction of the second fence was an unforeseeable event. But the very fact that reasonable minds can differ on this issue requires it be submitted for jury determination. Supporting our conclusion is the fact that if Harlan Electric Company is retained as a third-party defendant, as we have concluded it should be, the reference to the 1961 fence itself invites retaining as defendants those who built the first fence. Therefore, we hold that summary judgments in favor of Walter Couse Company and its subcontractor, Ornamental Iron and Stair Company, were error.

Third-party plaintiffs raise two other grounds for error. Except as noted in the footnote below, we believe our disposition of the third-party claim makes further discussion of these issues unnecessary.[8]

The verdict in favor of plaintiff and against defendants Edison and Pontiac Mall is affirmed. Costs to plaintiff. The summary judgments in favor of third-party defendants are set aside and the claim of third-party plaintiffs against third-party defendants is remanded for trial on the merits. Costs to third-party plaintiff.

All concurred.

---

[8] The Mall contends that under GCR 1963, 806.3(1)(a)(ii), the trial court had to certify that the order dismissing third-party defendants involved a controlling question of law. A full reading of the rule indicates to the contrary. The rule allows an alternative "or" under which the Mall could have filed an application for interlocutory leave to appeal but did not proceed to do so. Mall's issue number 3, namely, that the court erred in not granting its motion for judgment notwithstanding the verdict against third-party defendants becomes academic in view of our determination of this issue. If the issue should go to the jury as we have determined, obviously the motion should not be granted.