KOEHLER v. DETROIT EDISON COMPANY.

1. NEGLIGENCE—ELECTRIC COMPANY—BUILDING CONSTRUCTION SITE
—STANDARD OF CARE.

Electric company's knowledge that a building was under construction near its uninsulated power line and that mobile cranes were being used from time to time in that construction did not create a duty in the electric company to remove the charge, insulate the line, or notify the contractors of the dangerous condition.

2. NEGLIGENCE—DIRECTED VERDICT—QUESTION OF FACT—CONFLICTING TESTIMONY—CONTRIBUTORY NEGLIGENCE.

A directed verdict for two defendants in a negligence action was improperly granted where the legal relationships between defendants were in dispute, where there was conflicting testimony as to how the accident that killed plaintiff's spouse occurred, and where there was considerable and conflicting testimony as to the contributory negligence of plaintiff's spouse.

3. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—DUE CARE—QUESTION OF FACT—JURY DETERMINATION.

What conduct by a person constitutes due care for his own safety and relieves him of contributory negligence is a question of fact for jury determination.

4. NEGLIGENCE — CONTRIBUTORY NEGLIGENCE — ANTICIPATED NEGLIGENCE.

Contributory negligence cannot be imputed to a plaintiff for failure to anticipate negligent acts of a defendant.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 26 Am Jur 2d, Electricity, Gas, and Steam § 39 et seq.
[2, 5] 53 Am Jur, Trial § 332 et seq.
[3] 38 Am Jur, Negligence § 356
[4] 38 Am Jur, Negligence § 174 et seq.
[6, 7] 38 Am Jur, Negligence § 348.

5. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—INTERVENING NEGLIGENCE—DIRECTED VERDICT.

A directed verdict was improperly granted a defendant in a negligence action where the jury could have found that plaintiff's spouse was not killed by his own negligent act but by the intervening negligent act of that defendant.

6. NEGLIGENCE — CONTRIBUTORY NEGLIGENCE — WRONGFUL DEATH — PRESUMPTIONS — QUESTION OF FACT.

A plaintiff in a wrongful death action is entitled to a presumption of due care on the part of his decedent where defendant's proof of contributory negligence presents a question of fact for the jury.

7. NEGLIGENCE—LIABILITY—QUESTION OF FACT.

Directed verdict and judgment for two defendants in a wrongful death negligence action is reversed and a new trial ordered for plaintiff against those defendants where a favorable view of plaintiff's case indicates that there was sufficient evidence to present a question of fact for jury resolution as to negligence of defendants and contributory negligence of decedent.

Appeal from Court of Appeals, Division 1, J. H. Gillis, P. J., and McGregor and Thorburn, JJ., affirming Wayne, Thomas J. Foley, J.    Submitted January 12, 1970.    (Calendar No. 12, Docket No. 52,266.)    Decided March 9, 1970.

14 Mich App 367, reversed in part.

Declaration by Anna Koehler, administratrix of the estate of Carl Koehler, against Detroit Edison Company, a New York corporation, Leland Beard, doing business as Beard's Welding and Erection Co., Robert Pankey, and Palombit Construction Company, Inc., for wrongful death.    Directed verdict for defendants.    Plaintiff appealed to Court of Appeals as to defendants Edison, Beard, and Pankey. Affirmed.    Plaintiff appeals.    Reversed as to defendants Beard and Pankey and remanded for new trial.

*Kelman, Loria, Downing & Schneider (John W. Simpson, Jr.,* of counsel), for plaintiff.

*Fischer, Sprague, Franklin & Ford (David G. Barnett* and *Leon R. Jones,* of counsel), for defendant Detroit Edison Company.

*Fiekens, Dice, Sweeney & Sullivan,* for Leland Beard.

*Zweig, Taback & Remer,* for Robert Pankey.

ADAMS, J.

## I. *The Facts and Proceedings*

This wrongful death action was brought by the administratrix of the estate of Carl Koehler. Koehler was a subcontractor on a building job near Memphis, Michigan. On June 27, 1960, he received injuries which resulted in his death.

The building he was working on extended north and south. It was not of a uniform height, the southern part being higher than the northern portion. The roof on the northern portion was estimated to be 22 feet above ground level. Koehler was engaged in unloading and installing precast concrete slabs and T-joists. The slabs and joists were trucked to the building site and then unloaded by a crane. A truck, which was being unloaded, had been parked about 15 feet to the west of the building. A crane, owned by defendant Beard and rented by him to Koehler, was being used at the time to lift the slabs and joists to the roof of the building. The crane was sitting to the south of the truck and was positioned 15 to 20 feet from the building. The crane was mounted on its own truck or rig which was mounted on rubber tires and had a truck cab as well

as a crane operator's cab. The crane was equipped with a 60-foot boom and a 20-foot gib which extended to the north from the crane and which could be swung to the east or the west in the unloading operations.

On October 23, 1959, eight months prior to the accident, defendant Detroit Edison had completed construction and energized an electric distribution line to the building site. It consisted of three wires without insulating coating. The line ran in a north-and-south direction approximately 50 feet to the west of the building. The wires were strung at a height of 30 to 35 feet above ground level.

Koehler was shorthanded in his work force on the day of the accident. He had called the Ironworkers' Hall for help but they did not have anyone available and told him to hire whoever he could get on the job. He hired a couple of carpenters to work with him. The crew was insufficient for Koehler to have men on the truck and on the building. Consequently, he was trying to perform two jobs—first, hooking the cable to the material on the bed of the truck and, second, actually installing the material on the building itself.

Defendant Pankey, the crane operator, testified that on that day Koehler had ridden the sling or wire cable from the truck to the wall or from the ground to the wall and back again to the truck about half a dozen times. Pankey warned him that this was dangerous but Koehler went ahead anyhow. Koehler had also been warned that riding the cable was dangerous by Elbert Shinn, the general superintendent for Palombit Construction Company, one of the defendants.

Gordon Howcroft, one of the workers on the job, testified that just prior to the accident he was standing with another workman on the roof of the

south end or higher portion of the building. Another witness, Harvey Kaltz, was standing with Howcroft. Koehler was on the roof of the lower or north end of the building. Kaltz testified that shortly after 3 p.m. he saw Koehler step into the spreader which was at the end of the cable. He described the spreader as being two cables or double cables looped around and fastened into a ring. The cable from the crane had a ball near the end of it and a hook below that. The spreader was looped into the hook.

As Pankey, the crane operator, unloaded the truck, he could not see the concrete slabs after they went over the side of the building. There was an ironworker on the roof to give him his signals. At the time Koehler stepped into the spreader on the rooftop, Pankey could not see him. It was Pankey's testimony that just prior to the accident the ironworker gave him a signal to take the cable up and that, when he did so, Koehler was on the end of it. Koehler gave the signals after he came into view.

Witness Kaltz testified that when the crane operator raised Koehler from the roof to a place where the operator could see him, Koehler gave signals to boom it up or to raise the boom and that this signal continued as he was swinging off of the building. At the same time that Koehler was signalling to raise the boom, the crane was swinging to the north and west of the building. As the boom came around, it was going toward the west.

From this point on until Koehler was injured, there is substantial dispute as to what occurred. Gordon Howcroft testified that he saw Koehler being swung on the cable over near the power lines and that there was a flash or arc of blue light from the east wire of the power line which arced over to Koehler's body at about shoulder height.

At that time Koehler's head was above the power line with the rest of his body below it. He said that after the flash or arc occurred, Koehler's body seemed to bounce back and that he straightened up with his hands above his head, and then he appeared to go limp and went into a jackknife position and fell to the ground. Howcroft went down a ladder to the ground, walked to the place where Koehler lay and looked up at the wires. He stated that the east wire was still moving at that time. Howcroft testified that, after he fell, Koehler lay on the ground about midway between the wires and the slab truck which was being unloaded by the crane and that Koehler was facing to the north.

Kaltz said that he observed Koehler swinging toward the wires and signalling to raise the boom up and that, when he was within a couple of feet of the wire, he drew his hands back and seemed to go limp and started to fall toward the ground. Kaltz further stated that as Koehler was falling toward the ground he tipped forward and went face first and fell over a mound of clay. Kaltz went to where he lay. Koehler appeared to be unconscious. Kaltz also stated that at the time Koehler fell, the boom on the crane had gone beyond the truck, that is, to the west of the slab truck and was farther to the west than he had observed it at any other time during the day.

Pankey, the crane operator, testified that when Koehler came into view he noticed Koehler had one foot in the sling and was holding on to the cable by clamping it under his right arm; that as he swung the cable to the west, it appeared to him that Koehler's foot slipped out of the sling; that it looked like Koehler was trying to change position and that he slipped and fell to the ground. Pankey testified that at the time Koehler fell, the boom was 15 feet

to the east of the power line, that is, toward the building. It was further a part of Pankey's testimony that the place where Koehler was riding on the cable was about 30 feet from the top of the boom. Pankey stated that he had already swung Koehler beyond the truck before he fell. A deposition by Pankey was admitted at the trial, and in it he made the statement that Koehler landed on the ground about 10 or 15 feet west of the slab truck.

At the conclusion of plaintiff's proofs, in granting motions for directed verdicts, the trial judge found as to all defendants that there was no proof of negligence on their part. The court made a further finding as follows:

"However, the court does not stop here. The court finds, after due consideration of the presumption of due care due Carl Koehler, that there is clear, direct, positive and credible evidence of contributory negligence, and that reasonable persons could not decide other than that the decedent was in fact contributorily negligent, and that such contributory negligence was a proximate cause of the injuries to Carl Koehler—*thus adding a second reason* for granting the motions for directed verdicts in each of the cases herein mentioned." (Emphasis added.)

Appeal was taken to the Court of Appeals as to defendants Detroit Edison, Pankey and Beard. That court, without passing upon the question as to whether there was any evidence from which a jury might find defendants guilty of negligence, concluded:

"There is not one scintilla of evidence in the record from which a jury could draw a reasonable inference that plaintiff's decedent was free from contributory negligence." 14 Mich App 367, 370.

The judgment of the trial court was affirmed. We granted leave to appeal May 22, 1969 (382 Mich 755).

## II. *Negligence and Contributory Negligence*

With regard to negligence on the part of Detroit Edison, there is no testimony in this case from which a jury could find that the operation carried on with the crane was dangerous because of Detroit Edison's distribution line. The testimony is to the effect that there was sufficient room in which to work; that ironworkers fully understood the danger from electric wires and the importance of staying away from them; that there was no reason to expect trouble from the line or to alert Detroit Edison that a crane was to be used; that Koehler, Beard, Pankey, and others were aware of the existence of the line and could have requested Detroit Edison to insulate the line if they considered it necessary that such a step be taken; and that Detroit Edison was not apprised of the operation or requested to take any precautions. The mere fact that Detroit Edison knew a building was under construction near its power line and that, from time to time, mobile cranes were being brought upon the premises to be used in construction work, would not, standing alone, create a duty upon Detroit Edison to remove the charge, insulate the line, or notify the parties of a dangerous condition. We agree with the finding of the trial judge that there was no negligence on the part of Detroit Edison.

While there is no dispute with regard to the facts as to Detroit Edison, the question of the negligence of the other defendants and the contributory negligence of Koehler is quite a different matter. The legal relationships between Beard, Pankey, and Koehler are all in dispute. There is testimony that

Beard was in the business of renting cranes; that customarily Beard rented cranes with a furnished operator; that Pankey was hired the day before the accident by Koehler to replace a crane operator furnished by Beard with whom Koehler was dissatisfied; and that on the day of the accident Beard was on the premises, talked with Pankey and agreed to or did hire him. A jury might conclude that Pankey was Beard's employee, or that he was Beard's employee borrowed by Koehler, or that he was Koehler's employee, or finally that he was Koehler's employee borrowed by Beard. Beard's liability could be predicated upon a finding that Pankey was his employee or a finding that Pankey was Koehler's employee borrowed by Beard.

Just as the legal relationships of the parties are disputed, the testimony with regard to how the accident occurred, as has been noted, is also conflicting. There is testimony from which a jury might conclude that Koehler gave erroneous signals, thereby causing Pankey to swing the cable into the power line; that Pankey became confused, disregarded the signals of Koehler, and swung Koehler into the power line; or that, as the crane was swinging away from the building, for some reason wholly unconnected with the power line, Koehler lost his hold and fell.

Finally, with regard to the question of contributory negligence by Koehler, there is considerable testimony that the act of riding down the cable was dangerous. There is also some testimony that such activity goes on and may sometimes be necessary. Koehler had ridden down the cable before on the day of the accident. Presumably he would have had no difficulty in riding it down again 1) unless he lost his hold; or 2) unless he contacted the high tension wire. Assuming Koehler had placed himself in a position of peril, could Pankey have acted

to protect Koehler when he discovered the position he was in? Was it solely Pankey's acts that caused Koehler to fall, or the acts of Pankey and Koehler, or Koehler's acts alone?

What conduct on the part of an individual constitutes due care for his own safety is ordinarily a question of fact for determination by the jury under all the circumstances of the case and, therefore, is not a question of law. *Ingram* v. *Henry* (1964), 373 Mich 453, 457; *Barnebee* v. *Spence Brothers* (1962), 367 Mich 46; *Dismukes* v. *Michigan Express, Inc.* (1962), 368 Mich 197; *Detroit & Milwaukee Railroad Company* v. *Van Steinburg* (1868), 17 Mich 99, 117–119. For favorable comment on the *Van Steinburg* case and the significance of its holding, see concurring opinion of Justice BLACK in *Davis* v. *New York Central Railroad Company* (1957), 348 Mich 262, 274–275.

Contributory negligence cannot be imputed to a plaintiff for failure to anticipate negligent acts of a defendant. *Detroit & Milwaukee Railroad Company* v. *Van Steinburg, supra,* 119; *Winckowski* v. *Dodge** (1914), 183 Mich 303, 312; *Wright* v. *Delray Connecting Railroad Company* (1960), 361 Mich 619; *Pace* v. *Gibson** (1959), 357 Mich 315, 325; *Hoffman* v. *Burkhead* (1958), 353 Mich 47, 56.

On the record before us, the jury could have found that Koehler's death was caused not by a fall from the dangerous position he had taken at the end of the cable to ride it to the ground but by the intervening negligent act of Pankey in swinging the cable into the power line.

Finally, when defendant's proof of contributory negligence presents a question of fact for the jury,

---

* This case was adversely criticized for its pronouncements on assumption of risk in *Felgner* v. *Anderson* (1965), 375 Mich 23, 51, *et seq.*

plaintiff is entitled to a presumption of due care. *Mack* v. *Precast Industries, Inc.* (1963), 369 Mich 439, 454; *Hill* v. *Harbor Steel & Supply Corporation* (1965), 374 Mich 194, 208, *et seq.*

We conclude that upon favorable view of the plaintiff's case there was sufficient evidence to present questions for jury resolution under proper instructions from the court. *Ackerberg* v. *Muskegon Osteopathic Hospital* (1962), 366 Mich 596, 600; *Davis* v. *New York Central Railroad Company* (1957), 348 Mich 262.

The judgment of the trial court is affirmed as to Detroit Edison with costs to Detroit Edison. The judgment as to defendants Beard and Pankey is reversed. As to them, a new trial is ordered. Costs may be taxed by plaintiff against defendants Beard and Pankey.

T. E. BRENNAN, C. J., and DETHMERS, BLACK, T. M. KAVANAGH, and T. G. KAVANAGH, JJ., concurred with ADAMS, J.

KELLY, J., did not sit in this case.