SIGNS v THE DETROIT EDISON COMPANY

Docket No. 78-192. Submitted May 4, 1979, at Detroit.—Decided November 19, 1979. Leave to appeal applied for.

Plaintiff's decedent, Kenneth Signs, was an employee of R. L. Coolsaet & Sons, Inc. (Coolsaet). Defendant The Detroit Edison Company (Edison) contracted with defendant Consumers Power Company (Consumers) to construct additional gas facilities at one of Edison's substations. Consumers contracted with Coolsaet to remove and replace old pipe and concrete, among other things. Ames, another Coolsaet employee, was operating a crane when it came in contact with or very close to some of Edison's high voltage lines, resulting in the electrocution of Signs. Plaintiff, Linda Signs, widow of the deceased, collected worker's compensation benefits from Coolsaet. Plaintiff then brought an action for damages against Edison in the Wayne Circuit Court alleging negligence resulting in decedent's death. She later added Consumers and others as defendants. Plaintiff contended that Consumers was negligent in failing to provide for the safety of defendant and other Coolsaet employees by determining whether the overhead wires were hot and, if so, by taking steps to warn of them, have them de-energized or stop construction near them. Consumers claimed that it was insulated from liability to employees of its independent subcontractors. At trial it was disclosed that Coolsaet was the only subcontractor working on the project, that Consumers had a representative on the construction site who considered his job to be one of "inspector" and that Coolsaet was obligated to operate in a safe manner. At the close of plaintiff's proofs, the trial court, Patrick J. Duggan, J., granted Eidson's motion for a directed verdict and denied one made by Consumers. The jury

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 13 Am Jur 2d, Building and Construction Contracts § 135.
General contractor's liability for injuries to employees of other contractors on the project. 20 ALR2d 868.
[3] 75 Am Jur 2d, Trial § 610.
[4] 47 Am Jur 2d, Jury § 242.
Number of peremptory challenges allowable in civil case where there are more than two parties involved. 32 ALR3d 747.

returned a verdict for plaintiff against Consumers and the court denied motions for a new trial and judgment notwithstanding the verdict. Consumers appealed and plaintiff cross-appealed. *Held:*

1. A general contractor is generally insulated from liability for injuries to employees of an independent subcontractor. However, a contractor who retains control over any part of the work may come within an exception to the general rule and be liable. Consumers' placing of an inspector at the site, part of whose function was to protect the safety and integrity of the electric and gas installations, constituted a sufficient degree of control over the project to give rise to a duty on the part of Consumers to exercise reasonable care for the safety of plaintiff's decedent.

2. The trial court did not err in giving instructions taken from the Standard Jury Instructions and refusing to give certain requested instructions which were argumentative and slanted.

3. The trial court did not err in submitting the issue of proximate cause to the jury because, even though Coolsaet's employees were aware of the high voltage lines, reasonable persons could conclude that there were steps Consumers could have taken which would have prevented the accident.

4. The trial court did not err in granting plaintiff six peremptory challenges where there were four defendants, since the court rules give the court discretion to grant up to three per defendant where the defendants have adverse interests.

5. The trial court did not err in directing a verdict for Edison, the owner of the property, since nothing in the design or placement of the high voltage wires suggested that contact with a crane could be anticipated.

Affirmed.

1. MASTER AND SERVANT — NEGLIGENCE — GENERAL CONTRACTOR — SUBCONTRACTOR.

A general contractor is generally insulated from liability for injuries to employees of an independent subcontractor; however, a contractor who retains control over any part of the work may come within an exemption to the general rule and be liable.

2. MASTER AND SERVANT — INDEPENDENT CONTRACTOR — NEGLIGENCE.

A general contractor's placing of an inspector at the jobsite constitutes a sufficient degree of control over the project to give

rise to a duty on the contractor's part to exercise reasonable care for the safety of employees of a subcontractor where part of the inspector's function is to protect the safety and integrity of the installations on the site.

3. TRIAL — INSTRUCTIONS TO JURY — STANDARD JURY INSTRUCTIONS — COURT RULES.

The court rule providing that pertinent portions of Michigan Standard Jury Instructions (SJI) shall be given in each civil case in which jury instructions are given if (a) they are applicable and (b) they accurately state the applicable law requires that the SJI be used whenever they are applicable, accurate, and requested by a party (GCR 1963, 516.6[2]).

4. TRIAL — PEREMPTORY CHALLENGES — COURT RULES.

A trial court did not err in granting a plaintiff six peremptory challenges where there were four defendants since the court rules give the court discretion to grant up to three per defendant where the defendants have adverse interests (GCR 1963, 511.5).

*Ripple, Chambers & Steiner, P.C.* (by *Darrell M. Amlin* and *Michael S. Mazur),* for plaintiff.

*W. E. Wisner,* for defendant-appellant Consumers Power Company.

Before: J. H. GILLIS, P.J., and BEASLEY and R. B. WEBSTER,* JJ.

BEASLEY, J. Defendant, Consumers Power Company, appeals a $222,000 judgment on a jury verdict in favor of plaintiff for the wrongful death of plaintiff's husband, Kenneth Signs. Plaintiff cross-appeals a directed verdict in favor of defendant, The Detroit Edison Company, granted at the conclusion of plaintiff's proofs.

This death case arises out of the electrocution of Signs on July 14, 1972, at the Detroit Edison

---

* Circuit judge, sitting on the Court of Appeals by assignment.

Hancock substation in Commerce Township, Oakland County. Signs was electrocuted by a fellow employee who inadvertently brought his crane into contact with one of many Edison high voltage lines located at the electric power substation.

At this substation, Edison has electricity generating facilities powered by gas. To meet increasing demands, Edison contracted with Consumers to construct additional gas facilities at the site, and specifically, install a new meter station to measure gas flow to the Edison facility. In connection with the project, Consumers contracted with R. L. Coolsaet & Sons, Inc., to remove and replace old pipe and concrete, among other things. Signs was an employee of Coolsaet, as was Charles Ames, the crane operator.

On the day of the accident, Ames was operating a boom truck to remove old gas pipe from the area. On top of the truck was a 37-1/2 foot crane used to lift the pipe off the ground and onto a tractor. At the immediate site, 13,200-volt electric lines were 29 feet above the ground. Signs was electrocuted when Ames's crane came in contact with, or very close to, one of these Detroit Edison high voltage lines while Signs was pushing or otherwise in contact with the pipe held by the crane.[1]

At the time of the accident, only Ames and Signs were in the immediate area, although Frank Dzuris, Jr., Consumers' representative at the job site, was in the vicinity.[2] Subsequently, plaintiff received worker's compensation benefits from Cool-

---

[1] There was some testimony that the electric current "arced", and the parties stipulated that electricity cannot initially arc over one inch.

[2] The Coolsaet foreman, Dan Freppon, was also at the site, but he is now deceased.

saet.[3] Plaintiff then proceeded, on January 26, 1973, to bring suit against defendant Edison for damages. Two years later, on June 27, 1975, plaintiff added defendant Consumers and two others as parties defendant.[4]

Plaintiff charged negligence against Consumers for failure to provide for the safety of Signs and other Coolsaet employees. She contended that defendant Consumers, although placing its representative in the field, did not take steps to insure the safe and workmanlike compliance with the contract,[5] including determining whether the overhead electrical wires were energized and, if so, taking steps to de-energize them, warning of dangerous operation of a boom crane in close proximity to electrical wires, and suspending work as allegedly authorized by the contract.

Defendant countered that an employer of an independent contractor is insulated from liability for injuries to employees of the independent contractor[6] and noted that there are exceptions to this

---

[3] In 1972, plaintiff's maximum weekly worker compensation benefits, computed on the basis of two dependents, would have totalled around $72,000. The file indicates that counsel for Michigan Mutual Liability Insurance Company, the worker compensation insurance carrier for Coolsaet, filed an appearance as a "silent plaintiff" and, presumably, would obtain reimbursement from any recovery for worker compensation benefits paid.

[4] Shortly before trial, plaintiff made modest settlements with the two other defendants, Universal Equipment Company and Prentiss Company.

[5] The contract between Consumers and Coolsaet was not placed in the record because plaintiff's counsel, during discovery proceedings, indicated that he would rely only on part of the contract. The following provision was read into the record and was considered by the trial judge, although not by the jury:

"The Contractor [R. L. Coolsaet & Sons, Inc.] further agrees to do said work in a good, neat, safe, substantial workmen like and approved manner."

[6] See, Prosser, Torts (4th ed), § 71, p 468; 2 Restatement Torts, 2d, § 409, p 370; 41 Am Jur 2d, Independent Contractors, § 24, p 774; 57 CJS, Master and Servant, § 584, p 353.

general rule. Defendant claimed that none of these exceptions applied.

After plaintiff presented her case, defendant Consumers and defendant Edison each moved for a directed verdict. The trial court denied Consumers' motion, but granted that of Edison. As indicated, plaintiff cross-appeals the grant of a directed verdict to Edison.

After the jury verdict in favor of plaintiff, defendant Consumers moved for judgment notwithstanding the verdict, or, in the alternative, for a new trial. The trial court filed a detailed, written opinion denying Consumers' motion.

In reviewing denial of a directed verdict for defendant on completion of plaintiff's proofs, this Court considers proofs and reasonable inferences therefrom in a light most favorable to the plaintiff.[7] On appeal, we treat this issue together with Consumers' other claim, on its motion for judgment notwithstanding the verdict, that there was no jury-submissible issue of negligence against Consumers.

At the outset, we note that this case does not necessarily fit into any of the well-recognized compartments that are usually used as bases for analysis.

Detroit Edison is the owner of the land that comprises the construction site, the power lines and the electricity. For some time, defendant Consumers has furnished gas to defendant Edison at this substation and, in order to meet Edison's expanding need for gas, Edison contracted with Consumers to install new gas supply equipment. In order to avoid any interruption in the flow of natural gas during construction, Consumers constructed a bypass line. It then became necessary to

---

[7] *Humenik v Sternberg*, 371 Mich 667, 669; 124 NW2d 778 (1963).

remove and replace the old pipe. Consumers contracted with R. L. Coolsaet & Sons, Inc., to perform that work during which Signs was killed.

Thus, Coolsaet was a subcontractor of Consumers. At the time of the accident neither Consumers nor any other subcontractor[8] was working on this project.

Since the contract between Consumers and Coolsaet is not in evidence, we are left with only the testimony of the construction people as to what they understood their responsibility to be, plus the stipulation that Coolsaet was obligated to operate in a safe manner, as a means of determining the extent, if any, of Consumers' control over Coolsaet's operations.

We recognize the general rule which shields a contractor (Consumers) from liability to the employee of an independent subcontractor. We also note the voluminous pages devoted to the topic both by this Court and by the Michigan Supreme Court. We recognize that the type of work involved and the surroundings in which a plaintiff works, as well as the relationship between the independent contractor and the employer, are critical to any analysis of the issue of liability.

The testimony indicates that, during the work performed by Coolsaet, Consumers had a representative on the construction site. The first representative, Richard Garnett, never saw the contract between Consumers and Coolsaet. His supervisor told him of the job and gave him a blueprint of the meter stand in connection with which Coolsaet was to remove and replace pipe and concrete. As he viewed his job, Garnett was to see that the

---

[8] The record does not indicate that there were any other subcontractors of Consumers. However, L. E. Meyers, a subcontractor of Edison, was doing other work at the substation which was apparently unrelated to the Edison-Consumers contract.

construction proceeded according to the blueprints. Garnett considered himself an "inspector".

The supervisor told Garnett to be careful about the electric lines at the construction site. At the site, Garnett had a meeting with Coolsaet concerning the construction. Garnett testified that he was concerned about safety because of the numerous electrical lines in the area. He thought that the power would not be shut off for the job because he did not believe it could be done. The Edison employees working on a nearby tower came by at one time and told him to watch out because the electric wires were energized. Garnett was never told that he had authority to shut down the job. He claimed his job was to read the blueprints, not to supervise Coolsaet employees. Garnett went on vacation several days before the accident.

Garnett was replaced by Frank Dzuris, Jr. According to the testimony of Dzuris, the supervisor gave him the blueprints and the assignment. The job assignment was that Dzuris "was to be there to represent Consumers Power". Dzuris also knew nothing of the contract. He characterized his job as one to inspect, not to supervise. On his first day at work, he introduced himself to the Coolsaet employees. He did not feel he could reject the work without first referring the matter to his supervisor. No one at Consumers gave him any information concerning permissible distances from the power lines.[9] He did not know that the lines overhead carried 13,200 volts, but, even if he had known that information, he would not have considered it his responsibility to warn anyone at the site. He was aware that work was to be performed in a safe manner. Had he been instructed to do so,

---

[9] The Michigan Construction Safety Regulations require equipment to be kept more than six feet from electrical overhead lines. 1967 AACS R 408.2303.

he would have warned individuals concerning the unsafe conditions (presumably, meaning the presence of "live", energized, high voltage lines close to where the crane was removing pipes).

The immediate, or direct, cause of the accident was the operation of the boom truck by Ames, the Coolsaet employee, in contact with, or near, the Edison high voltage line. While Ames operated the crane, Signs was on the ground attaching the pipe to the boom cable. Ames saw the wires directly overhead from where he parked the boom truck. He was aware of safety rules which required cranes to remain several feet from electric wires. In fact, he testified he was aware of the 6″ × 6″ warning sign clearly visible under the controls inside of the boom truck advising to stay eight feet to ten feet away from electrical lines. Ames claims he stopped the crane boom six feet short of the wires and was going to drop the boom when he told Signs to let go of the pipe. At that time, he heard a buzz but warned Signs too late. When Signs was electrocuted, Ames was looking at the ground at Signs, who was handling the pipe. He was not looking overhead at the top of the crane boom.

In the trial court and on appeal, plaintiff relies on *Funk v General Motors Corp*[10] in which the Court concluded:

"We regard it to be part of the business of a general contractor to assure that reasonable steps within its supervisory and coordinating authority are taken to guard against readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workmen."[11]

---

[10] 392 Mich 91; 220 NW2d 641 (1974).

[11] Id., 104.

We find *Funk* distinguishable from the instant case. The Court in *Funk* limited this holding to the case of a general contractor who is supervising a number of subcontractors on the site. The justification for the holding was that in such a situation the general contractor is in the best position to insure the safety of the job.

In *Erickson v Pure Oil Corp*[12] this Court noted that *Funk* requires that two or more subcontractors will eventually work in the same area of the construction site.[13] Two members of the panel found this requirement to be behind the term "common work area".

We find *Funk* inapposite, as no evidence suggests that there was more than one subcontractor working at the site of this project. At the time, the only other crew working at Edison's Hancock substation was some distance away and was erecting a tower unrelated to the gas distribution project. Therefore, if plaintiff is to prevail, another theory supporting Consumers' duty, other than that espoused in *Funk,* must exist. As the inherently dangerous activity theory was not pled by plaintiff, we need not discuss whether such theory would have given rise to a duty on defendant's part.

The trial judge relied on *Estate of Clark*[14] in denying a directed verdict and in denying a motion for judgment notwithstanding the verdict or a new trial. In *Clark,* plaintiff's decedent, an employee of the general contractor, was killed at a construction project cave-in. There, the trial court held that the general contractor was responsible for the safety of the workers. Under the contract

[12] 72 Mich App 330; 249 NW2d 411 (1976).

[13] Id., 337.

[14] 33 Mich App 395; 190 NW2d 373 (1971), *rev'd on other grounds and remanded for judgment on jury verdict,* 388 Mich 637; 202 NW2d 300 (1972).

the defendant architect represented the owner and had authority to inspect the construction and to stop work, if necessary, to enforce safety requirements. Twenty percent of his fee was allocated to supervision of the project. Under those circumstances, this Court held that the plaintiff's decedent was within the zone of risk to whom defendant architect owed a duty. There was sufficient evidence for the jury to find that the architect had actual knowledge of the dangerous condition of the wall of the excavation and sufficient time and authority to correct the situation. In upholding the jury verdict against the architect, the Court found that the architect owed a duty to warn workers of danger and breached the duty and the breach was a proximate cause of the death. *Clark* is neither relevant nor controlling authority here, where the degree of control retained by Consumers is far less than that of the architect in *Clark.* In a sense, *Clark* is an architectural malpractice case involving architects who exercise supervisory control over contractors, including the general contractor.

The trial judge also relied on *Summers v Crown Construction Co*[15] in establishing the duty of defendant to plaintiff. In *Summers,* plaintiff, an employee of Kent Steel Company, an independent subcontractor, was severely injured when a power crane with a defective clutch owned by Kent dropped a load of steel on him. Plaintiff successfully claimed damages from defendant, who was the owner and general contractor for a shopping center, on the theory that defendant failed to exercise the broad control over safety practices on the job entrusted to it. Although the general contractor and subcontractor executed no written agreement, the general contractor's employees testified that

---

[15] 453 F2d 998 (CA 4, 1972).

they were under a duty to report "safety problems" caused by independent contractors. Defendant Crown's supervisors had authority to require the subcontractors to fix unsafe conditions. The evidence indicated that the clutch had slipped on three previous occasions, the defendant's superintendent knew of the defect and that, although he had ample time, he did nothing about it. Under these circumstances, the court held that, as a matter of law, the general contractor-defendant had a duty to plaintiff-employee of the subcontractor and was liable if he retained control over any part of the work. Defendant general contractor retained the right to prohibit the subcontractor from performing work in a dangerous manner. Thus, recovery for plaintiff was affirmed. The extent to which *Crown* is controlling authority here is diminished by the facts: (1) that *Crown* is a Federal case arising in and subject to Pennsylvania law; (2) that defendant is both landowner and general contractor; (3) the contract and the course of conduct extended greater control over safety practices of the independent contractor on the job with considerably more specificity than in the within case; and (4) defendant owner/general contractor had clear knowledge of an obviously defective, dangerous clutch in ample time to do something about it.

A case upon which the trial court did not rely, and which was not cited by the parties, is instructive regarding whether a duty is owed by defendant Consumers to plaintiff upon which liability might be predicated. In *Misiulis v Milbrand Maintenance Corp*,[16] defendants Fastenberg, the owners of a shopping center which was managed for them by defendant Woodsmall, entered into a contract

---

[16] 52 Mich App 494; 218 NW2d 68 (1974).

for roof repair with defendant Milbrand, an independent contractor. Plaintiff drove his motorcycle into a pile of gravel and debris which defendant Milbrand left in a shopping center roadway, in violation of a provision of the roof repair contract to clear away debris so as not to interfere with tenants or customers of the shopping center.

A jury verdict for plaintiff was affirmed on the basis that defendants, as lessors, were vicariously liable for negligence of defendant-independent contractor in making repairs on the leased premises which resulted in injury to foreseeable business invitees because they had a nondelegable duty to exercise reasonable care in making repairs. We distinguish *Misiulis* from the within case because it involves duties owed by owner-landlords to tenants and their business invitees which are determined nondelegable. While, for these reasons, *Misiulis* does not control here, the findings of law are relevant. In *Misiulis,* this Court observed that the general rule that a contractee is not vicariously liable for injuries to third persons sustained as the result of the negligence of an independent contractor employed by him is noted for its exceptions. The panel distinguished exceptions from the general rule and exclusions from the general rule. An employer may come within an exception to the rule and be vicariously liable. But, the employer may also be within an exclusion to the rule and be personally liable.

The *Misiulis* Court then went on to cite 2 Restatement Torts, 2d, § 414, p 387, for an exclusion from the general rule of nonliability:

"One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise

reasonable care, which is caused by his failure to exercise his control with reasonable care."

In determining whether the employer is maintaining sufficient control over the project to subject it to liability, the *Misiulis* panel cited Comment C to § 414:

" 'It is not enough [to impose liability under this section] that he [the contractee] has merely a general right to order the work stopped or resumed, *to inspect its progress* or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right to supervision that the contractor is not entirely free to do the work in his own way.' (Emphasis added.)" 52 Mich App 494, 500.

"Control" was further examined in *McDonough v General Motors Corp:*[17]

"An owner contracting to have construction work done on his property cannot reserve to himself '[t]he administration, inspection, assistance and other actions' which do or may authorize some measure of influence or dominion over the way the work is to be done, and yet maintain as a matter of law that such reservation 'shall not be construed' as undertaking supervisory control of the work 'or the means and methods employed by the Contractor'."[18]

Thus, the dispositive issue is: was there enough evidence that Consumers retained sufficient "con-

[17] 388 Mich 430; 201 NW2d 609 (1972).

[18] *Id.,* p 444. While *McDonough* involved the liability of an owner, the issue of control is analogous with regard to the liability of a general contractor for the safety of an employee of a subcontractor.

trol" over the project to bring Consumers within the exclusion from the general rule of nonliability? If so, there was a negligence issue for the jury.

As indicated, for purposes of reviewing the denial of Consumers' motion for directed verdict at the conclusion of plaintiff's proofs, we view the evidence and inferences therefrom in a favorable-to-plaintiff light. However, the appellate measure of the merits of Consumers' motion for judgment notwithstanding the verdict or, in the alternative, for a new trial requires review of all the evidence on this issue.

The question of whether plaintiff has established that Consumers comes within the exclusion from the general rule of nonliability is one of law for the trial judge.[19]

He reasoned that Consumers had a contract with Coolsaet which obligated Coolsaet "to operate in a safe manner", that Consumers' representatives at the site were there to see that Coolsaet performed the contract according to its terms, including the obligation "to operate in a safe manner", that Consumers' representative, Dzuris, knew or should have known that Coolsaet had contracted to operate in a safe manner, that Coolsaet was violating the safety rules by operating a crane within six feet of and under power lines that he had reason to believe were live, and that he, Dzuris, had the power and duty to correct this dangerous condition.

The trial judge further found that, in spite of this, Consumers' representative did not warn the Coolsaet employees and did not shut down the job until the dangerous, unsafe condition was cor-

---

[19] *Porter v Iowa Power & Light Co,* 217 NW2d 221 (Iowa, 1974); Prosser, Law of Torts (4th ed), § 37, p 206. We cite *Porter* only as authority on this limited issue. In general, we believe *Porter* departs from other Michigan precedents.

rected. He concluded that, under these circumstances, Consumers owed a duty to Signs and that there was a fact issue regarding breach and proximate cause for the jury to determine.

In reviewing this issue, we start with the fact that Signs was killed by the active, direct negligence of the crane operator a coemployee of Coolsaet. As indicated, under these circumstances, Consumers, as a contractee of Coolsaet, is not liable unless plaintiff establishes that Consumers comes within an exclusion from the general rule of nonliability. As indicated, although plaintiff did not offer in evidence the contract between Consumers and Coolsaet, there was testimony regarding the construction of the contract which they gave to their relationship.

In this regard, the record demonstrates that Consumers always had a representative on the site. The first representative had been specifically cautioned concerning the electric lines in the area. We can fairly infer that Consumers was properly concerned with industrial safety. In spite of Dzuris's testimony that he was not informed that he had a duty to watch Coolsaet employees for safe operation, at the time of the accident Dzuris was watching a bulldozer because he was concerned that unsafe operation of the bulldozer might precipitate a violent explosion of the gas main. The placing of a boom truck under the high voltage lines would appear to have been no less a proper subject for safety concerns.

On the other hand, both Consumers' representatives testified they were not involved in supervision of Coolsaet employees but were concerned only with checking the construction for compliance with the blueprints and specifications. By itself, this limited type of inspection is usually not

sufficient "control" to bring a general contractor wihtin the rule in Restatement Torts, 2d, § 414, Comment C.

Although this issue is close and difficult, we do not find the trial judge's ruling was clearly erroneous when he concluded, as a matter of law, that placing an inspector at the site, part of whose function was to protect the safety and integrity of the electric and gas installations, constituted a sufficient degree of control over the project to give rise to a duty on Consumers' part to exercise reasonable care for the safety of plaintiff's decedent. Consequently, we do not find that the trial judge's denial of Consumers' motion for directed verdict at the conclusion of plaintiff's proofs constituted error. Neither do we find that the trial judge's denial of Consumers' motion for judgment notwithstanding the verdict, or, in the alternative, a new trial, was clearly erroneous.

Once we conclude a duty existed, the issues become traditional fact questions of whether defendant Consumers breached the duty and, if so, whether the breach was the proximate cause of damage which, of course, were for the jury under a proper instruction from the judge.

Next, Consumers claims the trial court erred in failing to include in the charge to the jury its proposed instruction on negligence:

"When I use the word 'negligence', with respect to defendant's conduct, I mean the failure to do something which a reasonably careful person would do or the doing of something which a reasonably careful person would not do, under the circumstances which you find existed in this case. It is for you to decide what a reasonably careful person would do or not do under such circumstances.

"In this regard, Defendant Consumers Power Com-

pany is charged with negligence in failing to determine whether the electrical wires were energized or to take steps to de-energize them and Consumers Power Company is also charged with negligence in failing to give warning of a dangerous operation of a boom crane in close proximity to electrical wires which were observed by its employee in the field. I charge that if you find the employees of Coolsaet and Sons Inc. working on this jobsite the day of the accident knew of the dangers of the electric lines or knew to de-energize them, and the employees of Coolsaet and Sons, Inc. involved are accustomed to working around electric lines and when they knew of the presence of the electric lines in question could have requested that The Detroit Edison Company de-energize the electric lines and considered it necessary, and if you find that there was sufficient room in which the crane could safely work and if you find that members of the Coolsaet and Sons Inc. crew were accustomed to working in the vicinity of electric lines, knew of the dangers presented by electric lines, knew of the presence of the electric line in question and thought they had sufficient room in which to work and could have requested the Detroit Edison Company to de-energize the line if they considered it necessary, then you are instructed, if you find these facts to be true, that Defendant Consumers Power Company had no duty to warn Mr. Signs or other members of his crew of any danger presented by the electric line, that Defendant Consumers Power Company had no duty to take steps to de-energize the electric line, and that Defendant Consumers Power Company had no duty to determine whether the electric lines were energized. *Williams v Detroit Edison,* 63 Mich App 559 at 573 (1975)."

Instead of giving this instruction, the trial judge instructed according to Standard Jury Instructions 10.01, 10.02 and 10.03, and gave the following charge:

"When I use the words negligence with respect to defendant's conduct, I mean the failure to do something which a reasonable and careful person would do or the

doing of something that a reasonable person would not do under the circumstances which you find existed in this case. It is for you to decide what a reasonably careful person would do or not do under such circumstances.

"When I use the words ordinary care, I mean the care that a reasonably careful person would use under the circumstances which you find existed in this case. The law does not say what a reasonably careful person would do or would not do under such circumstances. That is for you to decide.

"It was the duty of the defendant in connection with this occurrence to use ordinary care for the safety of the plaintiff."

Consumers' proposed instruction was taken directly from an instruction approved of in *Williams v The Detroit Edison Co.*[20] In *Williams,* the trial court gave the instruction requested by defendant, Detroit Edison; the jury found no cause of action, plaintiff appealed and this Court affirmed. In so doing, this Court concluded that, based on the holding in *Koehler v Detroit Edison Co,*[21] in which Detroit Edison was also the party defendant, the instruction there given was not clearly erroneous. The *Williams* Court also suggested that in that case an instruction on duty to warn is to be given in both of two contexts: (1) where plaintiff had knowledge or reason to know of the dangerous situation; and, (2) where plaintiff claims he did not.[22] In *Williams,* the trial court had instructed in both contexts.

In the present case, defendant Consumers is not in the same position that The Detroit Edison

[20] 63 Mich App 559; 234 NW2d 702 (1975).

[21] 383 Mich 224; 174 NW2d 827 (1970). It should be noted that another reason for the Court's ruling in *Koehler* was the failure of plaintiff to object in the trial court to the jury instruction.

[22] *Williams, supra,* 573-574.

Company was in *Williams* and *Koehler,* as in those cases Detroit Edison was owner of the instrumentality which caused the injury. In the instant case, beyond dispute, it was well known to the parties that at this electricity power station there were many live, energized, high voltage electricity lines. Their numbers and size were plainly to be seen. In addition, representatives of Consumers and Coolsaet met at the site prior to commencement of the work, and Consumers told Coolsaet to be careful of the electric lines. Consequently, in this case, when we allude to a duty to warn, it is not of a general duty to warn of the presence of high voltage lines. There can be little, if any, question but that Coolsaet's crane operator was negligent in placing the boom truck under a high voltage line and in picking up pipe from that dangerous location, but, whether Consumers' inspector (1) saw or should have seen the dangerous location of the crane and, if so, whether he should have done something about it, *e.g.,* warned the crane operator of his obviously unsafe method of operation, (2) required Coolsaet to move the boom truck and to perform the work in a less dangerous fashion, (3) requested Edison to shut down the current, if that was possible, while the pipe and concrete were removed, picked up and replaced, (4) required insulation of the power lines, or (5) compelled some other less dangerous way of doing the work, were subjects concerning which relevant evidence could be offered and arguments of counsel could be had. The consideration by the jury rested within the framework afforded by the general definitions of duty, breach and proximate cause contained in the Standard Jury Instructions.

Consumers' proposed instruction is argumentative and slanted in its favor. In part, this proposed

instruction asks the court to give the jury Consumers' version of part of plaintiff's theory of liability and Consumers' version of facts, which alleged facts are pivotal. In addition, Consumers' proposed instruction is specific with respect to the prongs of its argument that it wishes to emphasize. On the other hand, the Standard Jury Instructions are neutral and leave to the jury the opportunity to sift the evidence and to weigh the conflicting argument with a view to deciding whether Consumers breached its duty to exercise reasonable care. GCR 1963, 516.6(2) provides:

"Pertinent portions of Michigan Standard Jury Instructions (SJI) published under authority of this sub-rule shall be given in each civil case in which jury instructions are given if (a) they are applicable and (b) they accurately state the applicable law."

In *Javis v Ypsilanti Board of Education*,[23] the Supreme Court held that use of the SJI is mandatory whenever they are applicable, accurate and requested by a party. We find that the use of SJI 10.01, 10.02 and 10.03 by the trial court was applicable, accurate and generally agreed to by plaintiff.

GCR 1963, 516.6(4) provides:

"This sub-rule does not limit the power of the court to give additional instructions on applicable law not covered by SJI. Additional instructions when given shall be modeled as nearly as practicable after the style of SJI, making them concise, understandable, conversational, unslanted and non-argumentative."

Under the circumstances of this case, we hold

[23] 393 Mich 689; 227 NW2d 543 (1975).

that the trial court had discretion regarding whether or not to give the specific additional instruction requested by Consumers. This is not a case where the specific additional instruction requested by Consumers was required to be given. We find that there was not any abuse of discretion in denial by the trial court of Consumers' request for the specific instruction.

Next, Consumers contends that there was no issue of proximate cause to send to the jury; that the failure to warn was not the proximate cause of decedent's electrocution, as both decedent and the crane operator were aware of the energized overhead lines. As previously indicated, we find that reasonable persons could conclude that, even though Coolsaet employees were aware of the high voltage lines, there were steps that Consumers could have taken that would have prevented the electrocution of plaintiff's decedent. Thus, the trial judge did not err in sending the fact issue regarding proximate cause to the jury.[24] We do not find the trial court's instructions to the jury clearly erroneous.

The final issue regarding the judgment against Consumers that merits discussion is based on the claim that error occurred when the trial judge granted plaintiff six peremptory challenges. Consumers' argument appears to be based more on the fact that the court chose an unusual formula for determining the number of challenges than that GCR 1963, 511.5 was violated.

GCR 1963, 511.5 gave the trial judge discretion to grant this plaintiff up to three peremptory challenges per defendant (here totalling 12 challenges) because the four defendants had adverse interests. The trial judge granted six because:

---

[24] *Miller v Detroit Cab Co,* 392 Mich 480; 221 NW2d 342 (1974).

"The Court felt that to give Defendants more than twice the number of peremptory challenges allowed Plaintiff would be unfair to Plaintiff. The Court felt that Plaintiff could fairly and adequately represent Plaintiff's interests with regard to the selection of the jury if Plaintiff had at least half as many peremptory challenges as Defendants. Such decision is and should continue to be strictly within the discretion of the trial court."[25]

We find this to be a proper exercise of discretion by the trial judge.

We now come to plaintiff's cross-appeal. Plaintiff claims the trial court erred in directing a verdict for Detroit Edison.

In the trial judge's opinion directing a verdict in favor of Edison the court found insufficient evidence to establish a duty or breach of duty by Edison. The court cited *Koehler v Detroit Edison Co, supra,* as controlling. In *Koehler,* defendant was unloading slabs of concrete from a building by crane. Edison had built an electric distribution line to the building site. The wires were 30 to 35 feet above the ground and uninsulated. Koehler was riding the sling of the crane from the truck bed to the roof and back. He had been warned of the danger of the wires. When his body came too close to the power line, an arc of electricity jumped to his body and killed him. The trial judge directed a verdict in favor of Edison. The Michigan Supreme Court, in upholding the directed verdict, concluded that there was no testimony from which the jury could find that operation of the crane was dangerous because of the distribution line. The mere fact that Edison knew a building was under construction near the power lines and that cranes

---

[25] Opinion of the court denying Consumers Power Company's motion for judgment notwithstanding the verdict and/or new trial.

would be used from time to time, standing alone, did not create a duty on the part of Edison to remove the charge, insulate the wires or warn the parties.[26]

In the instant case, review of the evidence indicates that Edison was not in control of the construction in which Coolsaet employees were involved. It was merely the owner of the property. Although Edison had a representative on the site, he was there to inspect another project. Edison was aware that a gas system was being installed in the area. Nothing in the design or placement of the electric wires suggested that contact of the wires by a crane could be anticipated. In *Wilhelm v The Detroit Edison Co,*[27] in which Edison had been involved in the planning, inspection and installation of electric wires to a shopping mall building, the court held that Edison was, or should have been, aware that trim below electric lines would need to be repainted frequently and yet made no provisions for preventing human contact with the wires. In the present case, the wires were 30 feet above the ground; in *Wilhelm,* the unguarded wires contacted the building in a position that Edison knew, or should have known, would create a danger to those who would work on the building. We find *Wilhelm* inapplicable.

We find the instant case is controlled by *Koehler.* There was not any evidence that Edison had sufficient control over the operation of Coolsaet employees and the project in general so that a duty to see that work was being done in a safe manner was imposed upon them.

Affirmed.

---

[26] *Koehler, supra,* 231.
[27] 56 Mich App 116; 224 NW2d 289 (1974).